## Rush E. Evans and Lillie K. Evans v. American Strawboard Company, a corporation.

### Gen. No. 11,353.

1. RESTRAINT OF TRADE—*when agreement is in.* An agreement entered into for the purpose of fixing and regulating the price of a particular commodity, and for the purpose of limiting its production in Illinois, is illegal as in restraint of trade.

2. FORECLOSURE SUIT—*what good defense to.* Where the consideration of a note secured by a trust deed sought to be foreclosed, arose by reason of an illegal combination agreement, foreclosure will be denied; and this, notwithstanding only part of such consideration may have had such illegal origin.

Foreclosure proceeding. Appeal from the Superior Court of Cook County; the Hon. JESSE HOLDOM, Judge, presiding. Heard in this court at the October term, 1903. Reversed and remanded with directions. Opinion filed June 9, 1904.

**Statement by the Court.** December 7, 1901, the appellee filed its bill to foreclose a trust deed made by the appel-

lants to secure a promissory note of the appellant, Rush E. Evans, dated July 1, 1898, for $4,000, bearing interest at six per cent, and conveying real estate in Cook county, Illinois.    The appellants answered, and subsequently filed a cross-bill, which they withdrew, and amended their answer, which, in substance, alleges that the indebtedness for which the note and trust deed was given was invalid and resulted from an illegal agreement or combination of certain persons and corporations, including the appellee, to illegally fix and regulate the price of strawboard in the United States, and to illegally limit and curtail the amount thereof produced and manufactured in Illinois and elsewhere, setting out the details of such illegal agreement and combination; also that said note and trust deed were executed and delivered to appellee without any good and sufficient consideration, and without any consideration whatever.    After replication the cause was referred to a master to take proof and report his conclusions, which was done, and the master reported, in substance, as follows:

The Standard Strawboard Company was formed for an illegal purpose, under the Illinois law; that the defendant, Rush E. Evans, as the representative of the Consumers' Paper Company, entered into an alleged combination with said Standard Strawboard Company; that after this company went out of business the officers and the defendant, Evans, arrived at an amount, which it was agreed Evans, as an agent of the Standard Company, should pay the said company as a balance due it.    Evans testifies that of this amount about $9,000 was fictitious, arising from book-keeping, and not being money that had come into his hands as such agent; that he paid all of the balance agreed on except $4,000 represented by the paper sued on.    If this sum represented a balance of money remaining in Evans' hands as agent, the debt would be a valid one and the bill would lie.    Evans' evidence that this balance represented book-keeping and not a *bona fide* sum of money is not contradicted, and notwithstanding the fact that Evans and the Standard Company agreed on a balance, of which this was

a part, the master finds that there was not consideration, in fact, for the note, and it would be invalid in the hands of the Standard Company. Therefore, the complainant must show that it obtained the note sued on *bona fide* and for a valuable consideration, and no such showing has been made. Evans, without protest or objection, made the note and trust deed sued on direct to the complainant at some time after he made a previous paper to the Standard Company, evidencing the same sum of $4,000, but no evidence is shown of any valid consideration passing from the complainant for the transfer of such previous paper, and such showing must have been made to enable complainant to maintain its bill. Evans paid interest on the note until its maturity without objection, and this delay in making objection would be such laches as would prevent his setting up such defense if it were shown that complainant was injured or lost any rights by such conduct of the defendant, but no showing of any such loss or injury is made. Recommends that the bill be dismissed for want of equity.

On a hearing before the chancellor exceptions to the report, in so far as it found that the indebtedness was fictitious and not for money that had come into Evans' hands as agent of appellee, that there was no valid consideration for the note, and that Evans was not indebted to the appellee, were sustained, and a decree of foreclosure rendered in the usual form, finding, among other things, that there was a valid consideration for the note and that Evans in August, 1897, was indebted to the Standard Strawboard Company in the sum of $4,000, being a balance of money in his hands as agent of that company, which indebtedness in the month of January, 1898, that company, for a valid consideration, transferred and assigned to the appellee. From this decree the appeal herein is prosecuted.

CLARENCE A. BURLEY and WILLIAM H. McSURELY, for appellants.

OSCAR P. BONNEY and WILLIAM H. HALLY, for appellee.

MR. JUSTICE WINDES delivered the opinion of the court.

That the appellee, through its agents and representatives, entered into, with appellant, Rush E. Evans, and others, an illegal agreement for the purpose of curtailing and limiting the production of strawboard in the United States, and to fix and regulate the price thereof in Illinois and elsewhere, is clearly established by the evidence in the record.   The general scheme was, in substance, as follows: To form a corporation under the laws of New Jersey, to be called the Standard Strawboard Company, in which the different persons and corporations in the United States engaged in the manufacture of strawboard should take stock, which was to be apportioned among the different stockholders in proportion to the daily production of each strawboard mill or manufactory represented.   The said Standard Strawboard Company was to enter into contracts with the several mills holding its stock, by which the company agreed to purchase the entire product of such mills at the cost price of production of strawboard, which was to be between $15 and $17 per ton, depending upon the style. The Standard Company was to maintain a central office in New York City, open accounts with each mill and give it credit upon the company's books to the amount of the mill's daily production at said contract price.   Certain persons to represent the different mills were to be appointed as "dealers," and each mill's production of strawboard which was to be credited to it upon the company's books was also to be charged to the "dealer" representing that mill, at an arbitrary price fixed by the Standard Company, which was the selling price to the trade.   Each mill was to manufacture the goods and ship them directly to the customer, who would remit the selling price either to the mill or to the "dealer," who in turn would remit to the Standard Company.   Another part of the scheme was to curtail the production of strawboard by what is called by the witnesses "leasing down" such mills, that is binding them, for a consideration, not to produce strawboard.   This part of the scheme is, however, not important in this case.   The

purpose of having a "dealer" to represent each mill was to conceal from the public the real transactions between the several mills and the Standard Company, which was in effect to credit each mill with the cost of the production of strawboard manufactured by it as though it were a sale to the Standard Company, and then charge each mill with the same production at the price for which it was sold to the real customer, the difference between the credits and charges, after the payment of expenses of the business of the Standard Company, being the profits which were to be distributed between the different stockholders of that company. The business of the Standard Company (which was organized under the laws of New Jersey as agreed) and its different stockholders, including the appellee, which was the largest stockholder, and the Consumers Paper Company, a corporation of Muncie, Indiana, another stockholder, of which said Rush E. Evans was president, was conducted according to the general scheme above stated from the month of August, 1895, until about January 1, 1898, when the Standard Company ceased doing business. As a result of this agreement the daily production of strawboard in the mills of the country was reduced about two hundred tons. All strawboard manufactured by the Consumers Paper Company during this period was credited to it on the books of the Standard Company at a price covering the cost of production, and at the same time was charged to Rush E. Evans, who was selected by the two corporations to act as the representative of the Consumers Paper Company and as "dealer," at an arbitrary price, which was fixed by the Standard Company and was the price at which the goods were sold. Evans, on the 13th of August, 1895, entered into an agreement in writing with the Standard Company, by which that company agreed to give him the exclusive sale of strawboard manufactured by the Consumers Company, and allow him the regular trade discounts allowed to other "dealers" of the Standard Company, upon certain conditions specified in the agreement, among which was that he would not sell strawboard at less

than the price list, terms and regulations which might be established from time to time by the Standard Company. This written agreement, however, was but a mere form to conceal the real dealings between the two corporations, as above stated.   Evans was the representative of the Consumers Company, and in all his transactions as "dealer," while in form he was agent of the Standard Company, he was really acting for the former company—was but a "dummy" used by the two corporations and the different stockholders of the Standard Company in order to carry out their scheme as above outlined.   It is true the evidence shows, that while acting in this capacity, Evans received certain moneys for strawboard sold either by him or the Consumers Company, but all moneys collected by him or the Consumers Company in this way were accounted for and turned over to the Standard Company.   Previous to the formation of said agreement between the Standard Company, its stockholders and Evans, the Consumers Company had entered into various sales contracts by which it had undertaken to manufacture and sell strawboard to the amount of about 1,500 tons, for periods extending as much as one year thereafter, at prices ranging from $17 to $18 per ton.   As a result of the said combination agreement, and soon after it was made, the Standard Company advanced the price of strawboard practically $10 per ton, and in some instances during the years 1895 and 1896 it was sold at from $27.50 to $32.50 per ton.   The Consumers Company had to carry out all its contracts above referred to at the contract prices, and billed the goods furnished to its customers under these contracts at the contract prices, though the same goods were credited to the Consumers Company on the books of the Standard Company at the cost of their manufacture, and were charged to Evans at the regular market price fixed by the Standard Company, at which like strawboard was sold by the Consumers Company and the other stockholders of the Standard Company to the general trade.   The difference between the contract prices under these contracts and the market prices fixed by

the Standard Company and charged to Evans was a loss which had to be borne by the Consumers Company, under the combination agreement. These losses to the Consumers Company amounted to about $9,000, and under the Standard Company's system of book-keeping were all charged to Evans, though he received nothing for the amounts for which he was so charged.

The account of Evans on the books of the Standard Company in the latter part of 1897, kept as above stated, showed that he was indebted to that company about the sum of $12,000 to $15,000, which this company insisted that he should pay. Representatives of the company had negotiations with Evans regarding it and the stock which the Consumers Company at that time held in Evans' name in the Standard Company, which resulted in an agreement that the Consumers Company and Evans should get fifty cents on the dollar for the stock, and would pay this balance as they made collections. They afterwards collected moneys and remitted the same to the Standard Company, so that the balance of Evans' account on that company's books was reduced to $4,000. The Standard Company, through its representative, some time after this balance had been reduced to $4,000, insisted that it should be paid by Evans, and threatened to bring suit against him unless it was paid or settled. Evans finally acknowledged in writing this balance to be due from him to the Standard Company, and delivered the writing to its representative. Thereafter this alleged indebtedness was transferred to the appellee by the Standard Company in payment of a claim of the former against the latter, and the appellee, through its president, called upon Evans to pay the balance to it. Evans asked indulgence, claiming that he was financially embarrassed, but finally agreed with appellee's president, in settlement of the claim, to give the note and trust deed in question, which was done. The appellee was the principal stockholder of the Standard Company, and through its officers and representatives knew all about the combination agreement between the Standard Company,

Evans v. American Strawboard Co.

the Consumers Company and Evans, and is chargeable, as a stockholder in that company, with every detail relating thereto. The fact that Evans was the mere representative of the Consumers Company and the manner in which he was charged upon the books of the Standard Company with the goods manufactured and sold by the Consumers Company, being a part and parcel of the said combination agreement, was known to the appellee. No money representing the amount of the note in question belonging to the Standard Company ever came to the hands of Evans as its agent, since, as we have seen, the losses of the Consumers Company on its old contracts amounted to $9,000 more than the money which came to the hands of Evans as the agent of the Standard Company. There was, therefore, no consideration whatever for the note in question, and the sole basis of the alleged indebtedness of Evans to the Standard Company was the said combination agreement. This agreement is clearly one in restraint of trade and illegal, because it was entered into for the purpose of fixing and regulating the price of strawboard and limiting its production in Illinois. Chicago, etc., Coal Co. v. People, *ante*, p. 75, and cases cited; Craft v. McConoughy, 79 Ill. 346–9; Bishop v. Am. Pres. Co., 157 Ill. 284–319; and Harding v. Glucose Co., 182 Ill. 551–615. It follows, in our opinion, that the learned chancellor erred in rendering the decree in question. The master's report is, we think, in the main clearly sustained by the evidence, and his conclusions based thereon are correct. It is contended by appellee's counsel that conceding the transactions between Evans and the Standard Company were illegal, and it is not claimed by appellee's counsel that they were not illegal, that fact cannot avail appellants as a defense in this case, because they say the aid of the illegal transactions is not necessary to establish appellee's case. It is true that appellee by the introduction of its note and trust deed securing the same made a *prima facie* case, which it was necessary for appellants to overcome before they would be entitled to a decree. This we think was done by the evidence, which establishes

the facts to which we have referred. This evidence is in no way met by any proof on the part of appellee.

It is also claimed that the note and trust deed in question is founded upon a new and separate consideration in no way tainted by the illegal combination agreement. This contention has no basis in the evidence outside of the *prima facie* case made by appellee by the production of the note and trust deed, which is fully overcome by the facts above referred to.

A further claim is made that the note and trust deed were given for an amount agreed upon between Evans and the Standard Company in an accounting between them of their differences, which settlement it is said was without fraud and binding upon them. This contention cannot, in our opinion, be sustained, for the reason that appellee is chargeable with notice of all the transactions growing out of the illegal agreement, and the evidence is clear that all money of the Standard Company which came to Evans as its "dealer," or to the Consumers Company, was accounted for and turned over to the Standard Company, thus leaving the sole and only consideration of the note and trust deed to rest upon Evans' promise, based upon an alleged debt, growing out of the terms of the illegal agreement. That being the sole basis of appellee's claim, a court of equity will not grant relief. Moreover, there can be no question under the evidence but that the alleged balance agreed upon between the Standard Company and Evans was in part, at least, based on the illegal agreement, and that is sufficient to preclude any recovery based thereon. The illegal part cannot be separated from the legal, if any, so as to make it a basis for a valid contract. Henderson v. Palmer, 71 Ill. 579; Ramsay v. Whitbeck, 183 Ill. 550–64, and cases cited.

It is also said that the appellee has, by the conduct of Evans, been misled to its injury, but we can find no basis in the evidence for any such claim.

The decree of the Superior Court is reversed and the cause remanded, and that court is directed to enter a decree dismissing the complainant's bill for want of equity.

*Reversed and remanded with directions.*