Neil P. Anderson, B. L. Anderson, and Morris E. Burney, co-partners as Neil P. Anderson & Company, and F. E. Anderson, M. D. Anderson, and W. L. Clayton, co-partners, as Anderson & Company v. The Shawnee Compress Company, a corporation, Gulf Compress Company, a corporation, T. F. Stubbs, W. H. Beatty, J. M. Aydelotte, and C. C. Hanson.

(Filed September 5, 1906.)

1. CORPORATIONS—Implied Power to Lease, When. Where a strictly private corporation finds it cannot profitably continue operations, and such financial exigencies exist as render such action necessary or appropriate, it may lawfully make a lease of its entire property for a term of years, although no express authority to lease is contained in the articles of incorporation.

2. SAME—Unlawful, When. A corporation, known as the Gulf Compress Company, was organized under articles of incorporation which stated that it was to conduct a general storage and compress business. Its capital stock, orginally $25,000.00, was increased to $1,000,000.00, of which $600,000.00 was in the form of treasury stock. It appeared that the object of the corporation was to gain control of the compress business in the cotton produc-

Anderson *et al.* v. Shawnee Com. Co. *et al.*

ing area, by means of purchase or lease, exacting from the lessor or vendor in every case a contract that such lessor corporation would not for a term of years engage in a like business "within fifty miles of any compress operated by the lessees," and that the the lessor's members, "individually and collectively" would render every assistance "in discouraging unreasonable and unnecessary competition:" **Held;** That such corporation, the Gulf Compress Company, so conducted, is unlawful and against public policy, its operation tending to the unreasonable restraint of trade, the prevention of competition and the establishment of a monopoly.

3. **SAME—Void Lease.** And where, in such case, a corporation, known as the Shawnee Compress Company formed for the local compression of cotton, undertakes because of the exigencies of its financial situation, to lease its entire property to said Gulf Compress Company for a period of years, and in such lease, to agree not to engage in the business of compression of cotton, within fifty miles of any plant operated by the "Gulf Company, and to aid such Gulf Company" in discouraging unreasonable and unnecessary competion; **Held:** That the execution of such lease will be perpetually enjoined, or if executed, the contract will be declared an unreasonable restraint of trade and therefore void on the ground of public policy.

(Syllabus by the Court.)

*Error from the District Court of Pottawatomie County; before B. F. Burwell, Trial Judge.*

*Shartel, Keaton & Wells,* for plaintiffs in error.

*Blakeney & Maxey,* and *Woods, Basham & Biggers,* for defendants in error.

### STATEMENT OF FACTS.

This action was commenced on May 2, 1905, in the district court of Pottawatomie county, Oklahoma, by the plaintiffs in error against the defendants in error, the purpose being to enjoin the execution of a certain lease contract by the Shawnee Compress Company, its officers and agents, to the Gulf Compress Company, defendants in error herein. In the absence of the regular district judge from said county,

the probate judge thereof issued a restraining order as against the defendants in error, Beatty and Stubbs. An amended petition was filed on May 13, 1905, to which a demurrer was presented and overruled. Thereupon defendants below filed an answer, which contained a general denial coupled with certain admissions and explanatory matter. Plaintiffs below demurred to this answer, and on said demurrer being overruled, filed a general denial as reply.

In order that a proper understanding may be had of the issues presented by the pleadings to the court below, so much of the matters set up therein as are essential to a proper consideration of the questions involved in this appeal is given here.

From the amended petition it appears that on April 24, 1905, the plaintiffs in error together owned one hundred thirty-nine shares of the capital stock of the Shawnee Compress Company, a corporation organized under the laws of Oklahoma and doing business at Shawnee, Oklahoma, capitalized at $50,000.00, with T. F. Stubbs as president, and W. H. Beatty as secretary; and that J. M. Aydelotte was president of said company for several years immediately prior to said date. That the Gulf Compress Company is a corporation existing under the laws of Alabama, having its principal office and place of business in the city of Memphis, Tennessee, with C. C. Hanson and R. E. L. Martin as president and secretary thereof, respectively. That certain action was attempted to be taken by the stockholders of the Shawnee Compress Company, looking to the leasing of the entire business, good will, property, franchise, etc., of the said Shawnee Compress Company to the Gulf Compress Company for a

period of five years, at a stipulated rental of six thousand dollars per year.

That the number of the board of directors of the said Shawnee Compress Company was attempted to be reduced from nine to three, the latter consisting of Stubbs, Beatty and F. E. Anderson. That on the 26th of April, 1905, said Stubbs and Beatty, assuming to act as a majority of the board of directors of said Shawnee Compress Company, pretended to hold a meeting, and thereat to pass a certain resolution authorizing themselves, as president and secretary, respectively, of such company, to execute the aforementioned lease contract to the Gulf Compress Company, and did on said date, attempt to execute a written lease to the said Gulf Compress Company on behalf of said Shawnee Compress Company, for the said period of five years at the stipulated rental of six thousand dollars per annum.

That said F. E. Anderson, a minority stockholder, protested and objected to all such actions of said Beatty and Stubbs. That no exigencies existed requiring the negotiation of such lease, and that the intention of the Gulf Compress Company, in procuring said lease, was to secure a monopoly of the compress business, and to restrict competition between the compresses already operated by said company and the compress previously owned and operated by the Shawnee Compress Company, and is therefore void, as being contrary to public policy, and in undue restraint of trade.

Other allegations are made, attacking the legality of the proceedings of the board of directors in and about the execution of the alleged lease contract, and such acts are characterized as *ultra vires,* and void, as against the rights of plaintiffs in error, minority stockholders of the said Shawnee

Compress Company. The prayer was that the contract be declared void, and that said Stubbs and Beatty be enjoined from assuming to act as president and secretary respectively of said company, and that said company or its officers take no further proceedings looking to the execution of the said lease.

Following a general denial, the matters alleged in the answer essential to the questions here are: First, as to the legality of the proceedings of the stockholders, and second, that the execution of said lease was rendered necessary and right by the exigencies of the financial situation of said Shawnee Compress Company.

To this answer, plaintiffs below filed a demurrer, which was overruled. They then filed a general denial by way of reply. The action was tried to the court, and resulted, on September 20, 1905, in judgment for defendant below, dissolving the temporary injunction, dismissing plaintiffs' amended petition, and taxing the costs of said action to plaintiffs. Motion for new trial was filed and overruled, and this proceeding in error was thereupon commenced, to review the action of the court below.

The lease, the execution of which is sought to be enjoined, denominates the Shawnee Compress Company as the "Landlord," and · the Gulf Compress Company as the "Tenant." After making provision for the leasing of all the personalty belonging to said Shawnee company, specifying the period to be five years, the rental six thousand dollars per annum, and covering various other items, such as repairs, damages by fire, flood, etc., providing for the itemizing of the leased property, etc., the contract contains the following language:

"6. The landlord shall not, during the term of this lease, without the consent of the tenant, directly or indirectly engage in the compression of cotton within fifty miles of any plant operated by the tenant.

"10. The landlord agrees and pledges the tenant its good will, moral and real support, and that it, individually and collectively, will render the tenant every assistance in discouraging unreasonable and unnecessary competition * * *. The tenant further agrees to in no way use its other compresses to the detriment of the Shawnee company during the term of this lease."

It further appears from the evidence at the trial that C. C. Hanson is the president of both the Atlanta Compress Company and the Gulf Compress Company, being a stockholder in each, and is the one who negotiated the lease in question. That the Atlanta Compress Company operates in the states of Alabama, Georgia and Florida and was organized and is owned and controlled solely by the carriers for their benefit. That the board of directors and stockholders of said corporation are composed entirely of railroad officials. That the Atlanta company controls the operation of twenty-five plants. That the Gulf Compress Company is a close corporation, chartered in Mobile, Alabama, and operating in the states of Alabama, Mississippi, Tennessee, Louisiana, Arkansas, Indian Territory and Oklahoma, and controlling the operation of twenty-seven compresses in those states located at various points therein. That none of the Gulf Compress Company's plants and the Atlanta Compress Company's compresses are operated at the same points.

It is further disclosed by the evidence that the capital stock of the Gulf Compress Company, as originally incorporated, was $25,000.00, but that it has, within the past year,

been increased to one million dollars, of which $600,000.00 is treasury stock. That its field of operation has been rapidly extended from Alabama to all the cotton growing territory; that it is at the present time engaged in the purchase or leasing of compresses at various points, and as testified to by its president, is "prepared to buy or lease, whichever proposition suits us best." It appears from the evidence that the negotiations conducted by Mr. Hanson with Stubbs and Beatty for the lease of the Shawnee plant were in pursuance of an effort to avoid, "directly or indirectly, the possibility if not probability, of unnecessary and unreasonable competition."

It is further disclosed by the testimony that the carrier pays for the compression of cotton, incorporating the cost thereof in its tariff. That tariffs for the hauling of cotton are established by the railroad, as well as hauling districts, or territories, within which the haul of cotton must be one way, or otherwise, the higher rate, denominated the terminal rate, applies, rendering it unprofitable to ship to other than the established point in the hauling district.

Other facts material to the propositions urged by counsel, disclosed by the evidence and other proceedings, will be stated in connection with the argument on the propositions they concern.

Opinion of the court by

PANCOAST, J.: The first error assigned is that the court below erred in not deciding that it was beyond the scope of the legal powers of the said Shawnee Compress Company to execute the lease contract in question. We find no express authority to lease set out in the articles of incor-

poration, but we are nevertheless of the opinion the weight of authority is that when a strictly private corporation finds it cannot profitably continue operations, it may lawfully make a lease of its entire property for a term of years. *Plant v. Macon Oil Co.,* 30 S. E. 567; *Morisette v. Howard,* 62 Kan. 413, 63 Pac. 756; 10 Cyc. 1138; *Phillips v. Aurora Lodge No. 104,* 87 Ind. 505; *Nye v. Storer,* 168 Mass. 53; *Ardesco Oil Co. v. North Am. Oil Co.,* 66 Pa. St. 375.

It is, however, only when such exigencies exist as necessitate or render appropriate such or similar action that this right can be exercised. The question, therefore, of the power of a private corporation to lease its entire property for a term of years, resolves itself to consideration of the financial exigencies of the company concerned, as indicated by the evidence; and while no special finding of fact is made in that regard in the case at bar by the trial court, yet this feature must necessarily have been considered, in the light of the evidence introduced at the trial, and the judgment based thereon. We find ample authority in the record for the action of the court below in this respect, and following the rule so often reiterated that it is unnecessary to cite authorities to sustain it, we must hold that where the record contains some evidence to support the finding of the trial court, the judgment will not be disturbed in this court on appeal.

The second proposition contended for, however, involves the consideration of another and far more important question, upon which it becomes the imperative duty of this court to pass. Does the contract, or so much thereof as is set out above, tend to the unlawful restriction of competition in the business it concerns, and thereby furnish an illegal monopoly of said business in the cotton growing communities and this,

in contemplation of the character of the transactions out of which the contract grew, the plan and mode of operation of the business of the purchasing or leasing company, and the objects or results accomplished, if not in fact intended or sought to be brought about?

Where a contract is brought before us for construction and adjudication, its validity is necessarily involved, and is usually the first point to which the attention of the court is challenged by counsel. In construing the instrument here, as well said by Mr. Justice Bradley, in *Oregon Steam Navigation Company v. Windsor,* 20 Wall. 64-68, it must be "judged according to the circumstances, and can only be rightly judged when the reasons and grounds of the rule of construction" of such contracts are carefully considered. The public welfare is the first consideration to which the courts will look, and then the question of whether the restraint upon the one party is or is not greater than the protection of the other requires. It is now the general holding that when one engaged in any business or occupation sells out his stock in trade and good will, he may make a valid contract with the purchaser binding himself not to engage in the same business in the same place for a time named, and this is about as far as contracts in restraint of trade have been upheld by the courts in this country or in England. But, when, by the practical operation of any contract, it encroaches upon the rights of the public and transgresses the liberty of free competition, consideration then for the public welfare and for society becomes paramount, and must predominate over any individual right to contract.

It is immaterial in determining the legality of such contracts whether or not it was entered into with any evil in-

tent, but the material consideration is its injurious tendency, and the power thereby given to control prices. Nor, in order to vitiate a contract, is it essential that its result should be a complete monopoly; it is sufficient if it really tends to that end, and to deprive the public of the advantages derived from free competition.

No one can read the contract in the case at bar, and fail to discover that considerations of public policy are largely involved. The intention of the agreement is to aid in securing the objects sought to be attained in the formation and organization of the Gulf Compress Company and its allied corporation, the Atlanta Compress Company; and that this object is to prevent competition in the compression of cotton throughout the cotton producing states cannot reasonably be doubted. Circumstances so strong that it is impossible not to give this interpretation to them point unerringly to this conclusion. It crops out time and again both in the language used during the negotiations for the lease of the Shawnee Compress Company's plant and in the contract itself, and in the testimony introduced on the trial below. True, the language is guarded, the parties are circumspect, it is only sought to "discourage unnecessary and unreasonable competition," but such language is to be taken and construed in the light of the actions of the parties, and in view of the attendant circumstances. The Gulf Compress Company is in the business of compressing cotton for hire. Its field of operation is as broad as language can make it. Its capital is one million dollars, of which six-tenths or six hundred thousand dollars remains in the treasury in the shape of treasury stock, the form most convenient, most immediately available for instant application. Its capital has

within the past eighteen months been increased from
$25,000.00 to an amount sufficient to buy or otherwise ab-
sorb almost all, if not the entire business of cotton compres-
sion conducted in the United States.   It, with the Atlanta
Company, now controls the operation of fifty-two compresses
out of which it owns but six, holding the remainder by lease
contracts, as testified to by the president of both companies,
similar to that under consideration here.   The officers of
neither of these companies have seen fit to declare a single
dividend since their incorporation, but the surplus of both
companies are held in the corporation vaults, for the very
purpose, as we may infer from the surrounding circumstances,
of increasing its holdings of such properties under like con-
tracts, in furtherance of a general policy to absorb the en-
tire business of compression of this commodity.   The real,
the veritable purpose actuating the officers of the Gulf
Compress Company, as disclosed by its plan of organization
and mode of operation, and as manifested by the circum-
stances surrounding the conduct of its business and the re-
sults of its management by them, is, beyond reasonable ques-
tion, to place within their power the control of the compress
industry, by purchasing or leasing those plants which are ad-
vantageously located in each of the hauling districts or ter-
ritories established by the carriers in their cotton tariffs.
Within certain boundaries, the haul must be one certain way,
and when the Gulf Company seizes the strategic point, under
its leases, competition within that district is annihilated.   It
may be true, as declared upon the witness stand by its presi-
dent, that such is not the purpose of this organization, then
the intention of its officers, as evinced in the declarations
which fall from their lips, is at wide variance from the pur-

16—Vol. 17

poses evidenced by the results they have brought about. Nowhere by the terms of the contract we are construing is the Gulf Compress Company obligated to continue the Shawnee plant in operation as an active factor in the cotton compress business. Its machinery might lie idle, its industry cease, for all the contract obligates them to the contrary. The territory within which the restriction on the Shawnee Company is to operate is practically unlimited. True, the agreement is that it "shall not directly or indirectly engage in the compression of cotton within fifty miles of any plant operated by the tenant," but under this clause, the Gulf Compress Company may establish a compress at any competitive point it pleases, and thereby wholly extinguish competition through those companies bound by its leases; and if with a few, why not with all, until the logical outcome is the establishment of a monopoly of that business throughout the cotton producing area, the closing of every avenue to competition, under leases identical with that under consideration here.

The cases cited by counsel for the defendants in error do not sustain the doctrine contended for by them. This case does not fall within that class of cases where contracts have been upheld, though the parties, by the contract, were restrained from carrying on the same business for a particular length of time and within a designated territory, but is one of that class which depend for their validity upon the situation of the parties, the nature of the business, the interests touched by the restrictions, and the effect of the contract upon the rights and welfare of the public. Tested by the general principles applicable to contracts of this character, this agreement is far more extensive in its outlook and more onerous in its intent than is necessary to afford a fair pro-

tection to the lessee.  And tested by the same principles, because of the considerations hereinbefore mentioned, it is equally clear' that the obligation is in general restraint of trade, opposed to public policy, and pursued to its logical outcome, tends necessarily to the establishment of a monopoly, and is therefore, to that extent, void.  We have examined numerous decisions in the investigation of this subject, and believe that the conclusion we have reached is the one most closely following the trend of modern authority, and in entire record accord with the latest judicial expressions and enunciations of the principles governing such contracts.  In our judgment, not only is the enterprise in which the Gulf Compress Company is engaged an unlawful one, as now conducted, but the contract in question in this case, being made to further its objects and purposes, is void on the ground that it is in unreasonable restraint of trade and against public policy.

Some of the cases which construe contracts of similar character are:  *Field Cordage Co. v. Nat'l Cordage Co.,* 6 Ohio Cir. Ct. 615; *Richardson v. Buhl, et al.,* 43 N. W. 1102; *Rakestraw v. Lanier,* 30 S. E. 735; *Lawrence v. Kidder,* 10 Barb; (N. Y.) 641; *Althen v. Vreeland,* 36 Atl. 479; *Consumers Oil Co. v. Nunnemaker,* 142 Ind. 560, 41 N. E. 1048; *Bingham v. Maigne,* 52 N. F. Super. Ct. 90; *Thomas v. Admr. of Wm. Miles, Dec'd,* 3 Ohio St. 275; *Western Wooden Ware Ass'n v. Starkey et al.,* 47. N. W. 604; *Small v. Minn. Electro Matrix Co., et al.,* 47 N. W. 797; *Dodge Stationery Co. v. Dodge,* 78 Pac. 870; *Roberts v. Lamont,* 102 N. W. 770; *Evans v. Am. Strawboard Co.,* 114 Ill. App. 450; *Texas Standard Cotton Oil Co. v. Adoue,* 19 S. W. 274; and many others.

In the case of *Field Cordage Co. v. Nat'l Cordage Co., supra,.* a lease for a term of years was made by a manufacturing company of the machinery in the mill of another like company, together with the latter's good will, but the lease failed to make provision for the operation of the mill where situated, and such lease was held void as in restraint of trade.

The case of *Richardson v. Buhl, et al.,* above cited, involved the consideration of a contract for the purchase of the entire property of a manufacturer of matches, it being the policy of the purchasing company to exact from every seller a bond that such manufacturer would not for a term of years engage in or aid anyone else in the manufacture of matches, "in any place where such action might conflict with the interests or diminish the sales, or lessen the profits of the purchasing corporation," and in an exhaustive opinion, Sherwood, C. J., held that such contract was "unlawful and against public policy," the object being to prevent competition and control the price of an article of necessity.

The contract construed in the case of *Thomas v. Admr. of Wm. Miles, Dec'd, supra,* was similar in its provisions to the one at bar, the seller binding himself "not to enter into nor be concerned in the kind of business which has heretofore been conducted or carried on by the said firm or any branch thereof, within the city of Cincinnati and shall not in any way interfere, with any agency established by said firm whether such agencies shall be located in Cincinnati or elsewhere," and upon appeal such contract was held to be "clearly opposed to public policy and therefore void."

Again, in the case of *Dodge Stationery Co., v. Dodge, supra,* under a statute almost identical with ours; excepting from the general operation of the law as to contracts in re-

straint of trade those concerning the selling of good will of the business, it was held that a contract by a vendor of stock in a corporation, binding him not to engage in the line of business conducted by the corporation, is void. And that occurs in the case at bar, since by the terms of the contract, the Shawnee Compress Company, and its officers "individually and collectively," bound themselves not to engage in the compress business in a territory practically unlimited. See also *Santa Clara Val. M. & L. Co. v. Hayes,* 76 Cal. 387; *Pacific Factor Co. v. Adler,* 95 Cal. 110; *Craft v. McConoughy,* 79 Ill. 346; *Clancy v. Onondaga Fine Salt Co.,* 62 Barb. (N. Y.) 395; *Arnot v. Pittson, etc. Coal Col.* 68 N. Y. 588; *Central Ohio Salt Co. v. Guthin,* 35 Ohio St. 666; *Shute v. Heath,* 42 S. E. 704; *Slaughter v. Coal, etc. 'Co.* 47 S. E. 247, 104 Am. St. Rep. 1013.

In view of the evidence in the record before us, we cannot judicially determine that any portion of the lease contract involved in the case at bar would unquestionably have been entered into, regardless of the two provisions hereinbefore quoted, and herein held unlawful; hence, the entire contract must fall. *Western Wooden Ware Ass'n v. Starkey, et al.,* 47 N. W. 604; *Bishop v. Palmer,* 16 N. E. 299; Wilson's Annotated Statutes, sec. 767.

In view, then, of the evident purposes of the leasing company, as indicated by its plan of organization, its abundant available treasury stock, its control, together with the Atlanta Compress Company, of fifty-two compresses scattered at various points over the Southern states, the area affected, the unlimited operation of the restraining clause, the general situation and the interests concerned, considerations of public welfare and regard for the public interests in the com-

munities effected, require us to hold that this lease is wider in scope and more restrictive in operation than necessary for the proper protection of the Gulf Compress Company in its lease, and being executed in furtherance of a monopolistic design inimical to the best interests of the public, is in unreasonable restraint of trade, and therefore void.

In view of the conclusion we have reached upon the second assignment of error, discussion of the remaining questions urged would serve no good purpose.

For the reasons above given, the judgment of the trial court is reversed, and this cause is hereby remanded to the district court of Pottawatomie county, with instructions for that court to render judgment in favor of the plaintiffs below in conformity with this opinion and the prayer of their amended petition.

Burwell, J., who presided in the court below, not sitting; all of the Justices concurring.