STATE v. DULUTH BOARD OF TRADE and Others. [1]

May 7, 1909.

Nos. 15,580—(32).[2]

**Violation of Anti-Trust Statute—Restraint of Trade.**

A combination, contract, or understanding, the direct and necessary effect of which is to stifle or restrict competition in trade or business, violates the anti-trust statute (chapter 359, p. 487, Laws 1899; R. L. 1905, § 5168), whatever may have been the intention of the parties.

**Same.**

A combination, the main purposes and effects of which are to foster the trade and increase the business of those who make and operate it, and which only indirectly and remotely restricts competition in trade or business, is not a "combination and conspiracy in restraint of trade," within the meaning of the statute.

**Combination to Fix Wages.**

An agreement or combination for the purpose of fixing and determining the value of wages or other charges for personal services is not within the prohibitions of the statute.

**Combination to Regulate Business.**

A combination formed by dealers in articles of a similar nature in a particular locality for the purposes of fairly regulating the methods of conducting business and providing rules for fair dealing among members, but which exercises no improper control over nonmembers and does not control prices or production, is not in contravention of the statute.

**Board of Trade Rule.**

Rule 26 of the Duluth Board of Trade which provides that all members of the board shall charge a uniform and determined rate of commission for selling grain for nonmembers, and provides penalties for the violation of such rule, is not in violation of the Minnesota anti-trust statute.

**Duluth Board of Trade.**

The Duluth Board of Trade, as constituted under its charter and rules, is not a conspiracy or combination in restraint of trade, or which restrains, limits, or interferes with free competition in the production of grain, or in the purchase and sale of grain at Duluth.

**Same—Rule 26.**

Rule 26 of the Duluth Board of Trade does not violate the Minnesota anti-trust statute, as its direct and necessary tendency is neither to re-

[1] Reported in 121 N. W. 395.      [2] October, 1908, term calendar.

strain trade by preventing competition in the business of buying and selling grain, nor to limit, fix, control, maintain, or regulate the price or production of any article of trade, manufacture, or use bought and sold within the state, nor to prevent or limit competition in the purchase and sale thereof.

**Monopoly Defined.**

The rules of the Duluth Board of Trade do not create, or tend to create, a monopoly. Trade and commerce is monopolized when, as a result of efforts to that end, previously competing businesses are so concentrated in the hands of a single person or corporation, or a few persons or corporations acting together, that they have power to practically control the prices of a commodity and to thus practically suppress competition.

**State Has Right of Appeal.**

In a proceeding by the state against a corporation and its officers, charging them with the violation of the anti-trust statute, the state may appeal from a judgment in favor of the defendants.

Proceeding in the district court for St. Louis county to forfeit the corporate franchise of the Duluth Board of Trade, and to restrain it and its officers from further transacting business under its rules, on the ground that they violate the anti-trust statute (Laws 1899, p. 487, c. 359.) The case was tried before Dibell, J., who made findings and ordered judgment in favor of the defendants. From the judgment entered pursuant to the order, plaintiff appealed. Affirmed.

In this proceeding the state seeks to forfeit the corporate franchise of the Duluth Board of Trade, and to restrain it and its officers from further transacting business under the present rules on the ground that they violate the anti-trust statute of the state. The appeal is by the state from a judgment in favor of the defendants, and the record presents the question whether the conclusions of law are justified by the findings of fact. The facts stand conceded. It appears that the Duluth Board of Trade was incorporated January 31, 1881, under chapter 20, p. 35, Laws 1868, and now has and exercises the powers conferred by G. S. 1894, §§ 2982–2984, inclusive. The Minnesota Farmers' Exchange is a corporation organized under the laws of the state of Minnesota, having its office and principal place of business at Minneapolis, with power to own and operate mills for the manufacture of flour and other mill products, and to deal in grain, farm and dairy products,

live stock, meats, agricultural implements and machinery, coal, lumber, and other articles.

The city of Duluth is one of the important terminal grain markets in the Northwest, and in the immediate vicinity thereof are found elevators, flour mills, and proper equipment for handling and marketing grain and other farm products. The board of trade does not buy, sell, or in any way deal in grain. Not more than twenty per cent. of those holding membership in the board are engaged in the grain or milling business at Duluth. Some are engaged in banking, marine insurance, and vessel agency business at Duluth, while others are engaged in the grain and other business outside of Duluth. The board merely furnishes facilities and conveniences for the transaction of the grain business, and to that end procures for its members information as to crop conditions and the grain markets of the world. It owns a building, of the value of $500,000, in which there is an exchange room, where actual trades are made and posted, and where grain is bought and sold. Persons engaged in the grain commission business, and others connected with vessel agencies and marine insurance, have their offices in this building. Two classes of commission men—those who sell for the owner grain coming into Duluth, and those who buy for the consumer at Duluth or Superior, or for transportation to lower lake ports or for foreign exchange—transact business on the floor of the board of trade. Practically all the grain bought and sold at Duluth is bought and sold on the board of trade, although some little grain, used for local consumption, is handled elsewhere.

The memberships in the board of trade, which originally cost $1,000 each, have all been disposed of, and are now held by various individuals. They are subject to sale, and the owners may become members of the board of trade upon certain terms and conditions prescribed by the board. The Minnesota Farmers' Exchange never applied for membership in the Duluth Board of Trade, and neither the board nor its officers or members in any manner conspired or combined to prevent the Minnesota Farmers' Exchange from having its grain handled or dealt in on the board, by threatening to boycott any member who might venture to handle its grain, or otherwise. Rule 27 of the board of trade provides that regular sessions shall be held from 9:30 a. m. to 1:15 p. m. daily, except Saturday, when trading shall cease at 12 o'-

clock noon, and that no firm, member, or corporation shall buy or offer to buy, sell or offer to sell, any grain or seed on track, by sample or to arrive, except during such trading hours and on the floor of the exchange.

The state charges that the board and its officers have violated the anti-trust statute by adopting and enforcing what is known as Rule 26, which is as follows:

"The following rates of commission are deemed to be just and reasonable:

### "GRAIN, ETC.

"Section 1. Receiving and selling on arrival, to arrive, or for some future month's delivery: Wheat, barley, rye, and flax, 1 cent per bushel; Durnum wheat, 1 cent per bushel; corn and oats, ½ cent per bushel; mill stuffs, 50 cents per ton; ground feed, 50 cents per ton; hay, 50 cents per ton, except that the minimum charge on hay shall be $5 per car. On sales to arrive, where delivery is not made, one-half of the above commission shall be charged.

"Sec. 2. Buying and shipping in cars in lots of less than 5,000 bushels: wheat, barley, rye, and flax, 1 cent per bushel; corn and oats, ½ cent per bushel. In lots of 5,000 bushels or more, not less than ½ cent per bushel.

### "WAREHOUSE RECEIPTS.

"Sec. 3. Buying lots of not less than 5,000 bushels, ¼ cent per bushel; no charge for selling same receipts. Selling warehouse receipts, lots not less than 5,000 bushels, ¼ cent per bushel; lots less than 5,000 bushels, ½ cent per bushel.

### "FOR FUTURE DELIVERY.

"Sec. 4. Buying and selling, ⅛ cent per bushel on lots of 5,000 bushels or more, and ¼ cent per bushel on lots of less than 5,000 bushels. Where delivery of warehouse receipts is made on such contracts, ¼ cent per bushel.

"Sec. 5. Between members of the Duluth Board of Trade, the rates of commission may be arranged without restriction.

"Sec. 6. In addition to the above there shall be charged such legit-

imate expenses as are necessarily incurred in caring for the property and guarding the interests of both consignor and consignee, including interest on advances. Interest shall be charged on all advances made to country shippers or members of other exchanges.

"The minimum rate to be fixed each year during August, for one year, by a committee of three, appointed by the president. Nothing in this rule shall be so construed as to prevent any special arrangement between consignor and consignee, by which a higher rate of commission, or interest, may be charged in special cases.

"Sec. 7. Every member of the association, and every person, firm and corporation, admitted to trade, or to do business therein, who shall charge less than the regular rates of commission, and interest, established by the rules of the association; or shall assume, or rebate any portion of the same, or shall, with intent to evade in any way, directly or indirectly, the regular rate of commission, established by the rules of the association; or shall with intent to cut, or to evade in any way, directly or indirectly, the regular rates of commission established by the rules of the association, purchase, or offer to purchase, any grain, or seed on track, at any railway station outside of and for delivery at the city of Duluth, or Superior, or who shall purchase, directly or indirectly, for his own account or otherwise, from any person not a member of the association, any grain, seed, or other commodity, dealt in upon the board, without charging and deducting from the purchase price the regular rates of commission and interest, if any, established by the rules of the association; or shall make or report any false or fictitious sales or purchases; or shall resort to any method of accounting, directly or indirectly, in violation of or contrary in purpose and effect to a strict adherence to the regular established rates of commission of the association, or shall, with intent to evade the regular rates of commission established by the rules of the association, directly or indirectly pay or give, or offer so to do, any money, or other consideration of whatsoever nature, to any person, to procure or influence' shipments or consignments of grain or seed in any form, or shall with intent to cut or evade in any way, directly or indirectly, the regular rates of commission established by the rules of the association, make use of any shift or device whatsoever, shall be deemed guilty of violation of the rules of the association establishing rates of commission, and, on

conviction thereof, shall be fined by the association not less than $1,000 nor more than $2,000, as the board of directors may determine, such sum to be paid into the general fund of the association.

"Sec. 8. Any member of the Duluth Board of Trade, who shall become the agent of, or who shall handle grain on commission, or otherwise, for any person, firm, or corporation, when such person, firm, or corporation is known to be buying or handling, or has attempted to buy or handle, grain for less rates of commission than provided in this rule, such member shall be considered as having violated this rule, and be held subject to the penalties prescribed.

"Sec. 9. Any charge of the violation of the foregoing provisions, or any part thereof, shall be by complaint in writing, filed with the secretary of the association. The party charged shall be summoned by written notice from the secretary, and shall appear before the board of directors of the association, who shall investigate and try the charge.

"Sec. 10. The board of directors shall offer a reward, not exceeding $1,000, to any person who shall furnish evidence that does convict any member of the Duluth Board of Trade, or any firm, corporation, or party admitted to trade or to do business in the Duluth Board of Trade, of a violation of the established rates of commission; the object of this rule being to prevent the demoralization resulting from the giving, either directly or indirectly, of compensation to station agents, elevator agents, bankers, brokers, merchants, or any other parties, at any locality whatsoever, to influence shipments or consignments of grain. But this rule shall not prevent the regular employment, by members of this association, of traveling men, but shall prohibit a division of commissions with such traveling men, who are not resident members of this association.

"Sec. 11. Any member of the Duluth Board of Trade may at any time submit in writing to the board of directors any question for interpretation under this rule, and the question and its interpretation shall be posted on the board for at least ten (10) days, and henceforth be to all intents and purposes a part of this rule."

Rules, substantially like those of the Duluth Board of Trade, relating to the qualifications of members and the manner of their admission, fixing a minimum rate of commission that may be charged upon

transactions for nonmembers, allowing rates and commissions between members to be arranged without restriction, providing for and charging interest upon advances, regulating the trading upon the floor of the exchange, and providing penalties by expulsion or suspension for violation of the rules, have been in force for many years in similar exchanges in New York, Philadelphia, Boston, Chicago, Minneapolis, Milwaukee, and elsewhere.

*Edward T. Young,* Attorney General; and *George W. Peterson,* Assistant Attorney General, for the State.

A trust is a contract, combination, confederation, or understanding between two or more persons to control the price of a commodity or service for their benefit and to the injury of the public. It tends to create a monopoly. State v. Firemen, 152 Mo. 1. Monoplies embrace two leading elements: An exclusive right or privilege on one side, and on the other a restriction or restraint on the public not existing before the monopoly was secured. In re Greene (C. C.) 52 Fed. 104; American Biscuit Mnfg. Co. v. Klotz (C. C.) 44 Fed. 721, 724. At common law monopolies were held unlawful as in restraint of trade and against public policy. 15 Am. & Eng. Enc. (2d Ed.) 847. The statutes now generally provide that unlawful combinations may be restrained by quo warranto or other appropriate proceedings. 27 Cyc. 908, note 58; R. L. 1905, § 5169. And it is generally agreed that these statutes are not in violation of the constitutional provisions guarantying liberty of property. State v. Firemen, supra; 27 Cyc. 910, note 83.

The grain and produce business is impressed with a public or quasi public character. From the time the grain reaches a country warehouse until it reaches a terminal point and is sold, and in the actual selling by commission men, the state assumes to control and regulate the grain trade.

The tests of illegality of combinations are: (1) The injury to the public. (2) A necessary consequence to control prices. (3) Limitation of production and suppression of competition. (4) Creation of a monopoly. The form assumed is immaterial in determining the question of illegality. Harding v. American, 182 Ill. 551. The statutes apply to existing combinations though formed before the passage of

the statutes. In re Davies, 168 N. Y. 89; Ford v. Chicago, 155 Ill. 166; U. S. v. Trans-Missouri Freight Assn., 166 U. S. 290.

Under the anti-trust act of 1890, the test of illegality is not the reasonableness of the rates maintained by a combination, nor the intent with which the combination is entered into, nor yet its actual present effect, but the power it has or may have to produce the same or another or different effect in the future, such effect being restraint on trade and commerce. U. S. v. Trans-Missouri Freight Assn., supra; U. S. v. Joint Traffic Assn., 171 U. S. 505. Even at common law there was no question of reasonableness open to the courts with reference to such a contract. U. S. v. Addyston Pipe & Steel Co. (C. C. A.) 85 Fed. 271.

Rule 26 of the Duluth Board of Trade in and of itself is an unlawful restraint of trade, and an unlawful limitation upon open and free competition in the purchase and sale of grain, and, as such, a violation of the statute.

The opinion in Bohn Mnfg. Co. v. Hollis, 54 Minn. 223, that any man has a right to refuse to work for or deal with any man or class of men, and that this right, which one may exercise singly, any number may agree to exercise jointly, was rendered prior to the enactment of our anti-trust law and is inapplicable to the statute. The courts of Missouri and Indiana have shown the danger of attempting to apply the reasoning of the Bohn case to all combinations, regardless of their character. Jackson v. Stanfield, 137 Ind. 592; Ferd Heim Brewing Co. v. Belinder, 97 Mo. App. 64.

The vice of combinations lies in their possibilities. There are no saving features, either in intent, substance or effect, which can save Rule 26 from condemnation; neither its reasonableness, nor its limitations, nor the good intent in it, nor that it is justifiable and does not increase profits but lessens expenses and guards against other competition, nor that it may be a benefit to the public, and neither the fact that the board itself does no business.

*Davis, Kellogg & Severance* and *Sullivan & Grant,* for respondents.

This is an action brought to enforce a penalty for the violation of a criminal statute. It is not an information in the nature of quo warranto. Hence no appeal lies from a judgment of not guilty. It is im-

material whether the proceeding be criminal in form by prosecution under indictment or complaint or civil in form. The real test is whether it is criminal in fact. If so, no appeal is allowed. The test is whether the purpose of the suit or proceeding is to vindicate private right or punish public wrong. If the latter, then the case is criminal and no appeal will lie. 12 Cyc. 796.

The statutes of Minnesota under which the defendant was incorporated, and subsequent laws giving it enlarged powers, fully authorize the adoption and maintenance of the rules in question. The statutes authorizing the incorporation of boards of trade and chambers of commerce, should both be so construed as to render neither nugatory. "It must be assumed that the law making body knew and had in mind the general system of law into which this statute was by it injected and that it was intended to operate in harmony therewith." Reeves v. Ross, 62 W. Va. 7, 11. Great effect should also be given to the practical construction of the statutes for many years.

A first, primary, and it would seem all-sufficient, answer to the claim made by the state, is that the anti-trust law does not cover, nor does it purport to cover, combinations or organizations of men who charge for personal services rendered. The law having been as stated in Gray v. Building Trades Council, 91 Minn. 171 and in Bohn Mnfg. Co. v. Hollis, 54 Minn. 223, we must conclude that the legislature designedly left out of the statute any reference to organizations of men who jointly fixed the price that they would charge for services rendered. This rule does not operate to permit a boycott. Ertz v. Produce Exchange of Minneapolis, 79 Minn. 140. It is clear that the defendant corporation is fully authorized to make and enforce the rules now in existence and that they are not in restraint of trade.

ELLIOTT, J. (after stating the facts as above).

The trial court found that the Duluth Board of Trade, as organized and conducted, is not an arrangement, conspiracy, or combination in restraint of commerce within the state; that it does not restrain, limit, interfere with, or destroy open and free competition in the purchase and sale of grain at Duluth; that competition between seller and buyer is active and free; that the board does not fix prices of grain, nor prevent nor limit competition in the purchase or sale of grain; but that

the facilities which it furnishes are in aid of the traffic in grain from the point of production to the point of consumption.

1. The right of the state to appeal in a proceeding of this nature has been discussed by counsel at great length. The action is in form a civil proceeding, wherein the state seeks to obtain a judgment forfeiting the corporate privileges, powers, and franchises, dissolving the corporation, and disposing of its property, and enjoining the defendants and each of them from in any way continuing the alleged conspiracy, and from in any way interfering with, restraining, or limiting open and free competition in the sale and purchase of produce, in the Duluth market or elsewhere. It is authorized by the statute, and is a civil proceeding, notwithstanding the fact that the statute makes the prohibited acts criminal. Without entering upon an extended discussion of the question, we sustain the right of the state to prosecute the appeal.

2. The finding that there has been no conspiracy or boycott against the Minnesota Farmers' Exchange, and that it never applied for membership in the Duluth Board of Trade, leaves but one question to be determined, and that is whether, by the promulgation of rule 26 and the transaction of business thereunder, the defendant has entered into a combination, contract, arrangement, or conspiracy in violation of chapter 359, p. 487, Laws 1899.

The public policy of this state with reference to combinations and agreements which tend to restrain trade, and limit, restrict, or regulate the production, price, and distribution of articles of trade, manufacture, or use, has been declared by constitutional provisions and statutory enactments.

In 1888 there was embodied in the organic law of the state a declaration that "any combination of persons, either as individuals or as members or officers of any corporation, to monoplize the markets for food products in this state, or to interfere with, or restrict the freedom of such markets, is hereby declared to be a criminal conspiracy, and shall be punished in such manner as the legislature may provide." Const. art. 4, § 35. In 1891 the legislature enacted a statute denouncing as illegal all combinations to fix prices or to control the production of any commodity. Chapter 10, p. 82, Laws 1891. In 1899 the provisions of this statute were elaborated and re-enacted as chapter 359 of the

Laws of that year, which was in force when the present action was commenced. It provided that:

"Any contract, agreement, arrangement, or conspiracy, or any combination in the form of a trust, or otherwise, hereafter entered into which is in restraint of trade or commerce within this state, or in restraint of trade or commerce between any of the people of this state and any of the people of any other state or country, or which limits or tends to limit or control the supply of any article, commodity or utility, or the articles which enter into the manufacture of any article or [of] utility, or which regulates, limits or controls or raises or tends to regulate, limit, control or raise the market price of any article, commodity or utility, or tends to limit or regulate the production of any such article, commodity or utility, or in any manner destroys, limits or interferes with open and free competition in either the production, purchase or sale of any commodity, article or utility is hereby prohibited and declared to be unlawful. * * *

"Any corporation heretofore or hereafter created, organized or existing under the laws of this state which shall hereafter either directly or indirectly make any contract, agreement or arrangement, or enter into any combination, conspiracy or trust as defined in section one (1) of this act, shall, in addition to the penalty prescribed in section two (2) of this act, forfeit its charter, rights and franchises, and it shall thereafter be unlawful for such corporation to engage in business, either as a corporation or as a part of any combination, trust or monopoly, except as to the final disposition of its property under the laws of this state."

With the exception of a provision prohibiting boycotting (chapter 194, p. 269, Laws 1901), no further changes were made in the law until the adoption of the Revised Laws of 1905, in which the act of 1899 appears in substance as sections 5168 and 5169. Section 5168 provides that: "No person or association of persons shall enter into any pool, trust agreement, combination, or understanding whatsoever with any other person or association, corporate or otherwise, in restraint of trade, within this state, or between the people of this or of any other state or country, or which tends in any way or degree to limit, fix, control, maintain, or regulate the price of any article of trade, manufacture, or use bought and sold within the state, or which limits or tends

to limit the production of any such article, or which prevents or limits competition in the purchase and sale thereof, or which tends or is designed so to do. Every person violating any provision of this section, or assisting in such violation, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars nor more than five thousand dollars, or by imprisonment in the state prison for not less than three nor more than five years."

A subsequent statute (chapter 252, p. 342, Laws 1907) makes it unlawful for persons or corporations handling grain at public warehouses in the state to enter into any combination, contract, agreement, or understanding with any other person or corporation owning or operating any other public warehouse at any railway station, whereby the amount of grain to be received or handled shall be equalized or pooled between such warehouses, or whereby the profits or earnings derived from such warehouses shall be divided or pooled or apportioned in any manner, or whereby the price to be paid for any kind of grain at such station shall be fixed or in any manner affected.

3. The Minnesota anti-trust law is framed along the lines of the federal statute, although it is more diffuse. It may fairly be assumed, however, that the general purpose of all statutes of this kind is the same, and we may therefore properly look to the decisions made under federal and state statutes of a similar character for the principle by which to construe our own statute. State v. Northern Securities Co. (C. C.) 123 Fed. 692. The first clause or part of the statute prohibits agreements and combinations in restraint of trade, thus following the language of section 1 of the federal statute (Act July 2, 1890, c. 647, 26 St. 209 [U. S. Comp. St. 1901, 3200]). This general language is then followed by provisions which specifically forbid combinations or agreements which tend in any way to limit, fix, control, maintain, or regulate the price or production of any article of trade, manufacture, or use bought and sold within the state, or which prevents or limits competition in the sale or purchase of the same. The statute thus specifically refers to such agreements as affect the price or production of articles of the kind named, or competition in the purchase and sale thereof.

We have reached the conclusion that, in view of the statutory powers of the Duluth Board of Trade, the nature of its business, and the services for which the uniform charges are required to be made, the agree-

ment embodied in rule 26 does not constitute a combination, contract, or understanding in restraint of trade or commerce within this state, nor does it tend to limit, fix, maintain, control, or regulate the price or production of any article of trade, manufacture, or use, or to prevent or limit competition in the purchase or sale of the same, within the purview of the anti-trust statute. All cases of this character must be determined and controlled by their own facts, and before examining the anti-trust statutes and decisions, for the purpose of trying to find some controlling principle, it may be well to ascertain the statutory powers of the Duluth Board of Trade, the nature of its business, and the conditions under which it is carried on.

In 1868 (chapter 20, p. 35, Laws 1868) the legislature enacted a law which authorized any number of persons, not less than three, in any town or city having a population of more than three thousand, to proceed according to the provisions of title 3, c. 34, G. S. 1866, for the organization of corporations for purposes other than pecuniary, to "associate themselves and become incorporated as a chamber of commerce, or board of trade, for the purpose of advancing the commercial, mercantile and manufacturing interests of such city or town, for inculcating just and equitable principles of trade; for establishing and maintaining uniformity in the commercial usages of such city or town; for acquiring, possessing and disseminating useful business information, and for adjusting the controversies and misunderstandings which may arise between individuals engaged in trade, and for promoting the general prosperity of such city or town." The ordinary powers were conferred upon such corporations, and in addition thereto they were authorized to constitute committees of reference and arbitration and committees of appeals, to be governed by such rules and regulations as may be prescribed in the rules, regulations and by-laws, for the settlement of matters of difference between members of the association and other persons not members. They were authorized to "examine measures, weigh, gauge or inspect flour, grain, provisions, liquor, lumber, or any other article of produce or traffic commonly dealt in by the members of said corporation, and the certificate of such person or inspector as to the quality or quantity of any such article, or their brand or mark upon it, or upon any package containing such article, shall be evidence between buyer and seller, of the

quantity, grade or quality of the same, and shall be binding upon the members of said corporation, or others interested, and requiring or assenting to the employment of such weights, measures, gauges or .inspectors."

Chapter 20, p. 35, Laws 1868, was carried forward into G. S. 1878, where it became sections 197–199, inclusive, of chapter 34. Chapter 37, p. 54, Laws 1881, amended section 2, c. 20, p. 36, Laws 1868, and provided that corporations organized thereunder "shall have full power and authority to purchase, improve, hold, use, rent, mortgage, sell and convey such real and personal property as it may deem advisable, and may by resolution or by-law prescribe the terms and conditions of membership and the mode of admitting members; and in like manner may prescribe what officers it will have, their mode of election or appointment, and their functions and duties, and generally as to the management and transaction of all its business and affairs." In 1883 (chapter 138, p. 193, Laws 1883) the legislature enacted a new statute providing for the organization of chambers of commerce and boards of trade. This statute expressly legalized all such corporations which had been incorporated under chapter 20, Laws 1868, and chapter 37, Laws 1881, and. conferred upon them all the power, authority, and jurisdiction conferred on such as should be organized under the new act. By this act the powers of such corporations were specifically stated and somewhat, enlarged. The 1868 statute had provided that such corporations could be organized "for establishing and maintaining uniformity in the commercial usages of such city or town." The act of 1883 authorized their creation in counties, as well as in cities and towns—the restriction as to population being retained—and added, after "maintaining," the words "and enforcing." Fines for a breach of the rules, regulations, and by-laws might be imposed on the members and collected in the courts as in an action for debt. In 1887 (chapter 87, p. 138, Laws 1887) section 1 of the act of 1883 was amended so as to provide for the organization of chambers of commerce or boards of trade, or both, in any organized village, city, town, or county, without reference to the population thereof. The existing statute became sections 2982–2984, inclusive, subtit. 7, tit. 3, c. 34, G. S. 1894, and section 3112, et seq., R. L. 1905.

The Duluth Board of Trade was organized January 31, 1881, under the 1868 statute, and two months before the enactment of chapter 37, Laws 1881. The articles of incorporation stated that: (1) "The general nature of its business is to establish and maintain uniformity in commercial usages; to inculcate just and equitable principles of trade; to adjust controversies and business disputes; to acquire and disseminate valuable business information, and particularly to maintain a commercial exchange, and to secure to its members the benefits of co-operation in the furtherance of their legitimate pursuits. The principal place of the transaction of said business is in Duluth, St. Louis county, state of Minnesota." (2) "The qualifications and terms of membership in this corporation shall be subject to such by-laws and to such fees and assessments as may be fixed by the board of directors from time to time." By virtue of the provisions of the subsequent statutes its powers were made the same as similar corporations organized under the later law. It has continued to exist until the present time, and R. L. 1905, § 2838, provides that "all private corporations existing and doing business at the time of the taking effect of the revised laws shall continue to exercise and enjoy all powers and privileges possessed by them under their respective articles of incorporation and the laws applicable thereto then in force.  *  *  * "

It is through such organizations as the Duluth Board of Trade that the grain trade of the Northwest has been and now is largely transacted. The purposes for which such corporations may be created are stated in the statute and in the articles of incorporation of this defendant. The primary object is to furnish facilities for the proper conduct of business. The board of trade itself neither buys nor sells grain. It maintains an exchange room where the representatives of buyers and sellers meet and compete, and their competition results in trades in grain. It maintains telegraphic communication with other grain markets, and furnishes and posts information as to such markets and as to crop conditions generally. It has a building, in which its members engaged in the grain trade have offices, as do others who are connected more or less directly therewith. It is not claimed that the board fixes prices at which grain is purchased and sold. It collects and publishes statistics. It

makes a market, in the sense that it keeps a record of actual trans-actions in the buying and selling of grain, thus making a Duluth market, in the sense that there is a Chicago and Minneapolis market. These things necessarily promote, instead of restrict, the grain trade. As said by the trial court, instead of limiting competition in the purchase and sale of grain, "the facilities which it furnishes are in aid of the traffic in grain from the point of production to the point of consumption."

The nature of the grain business seems to require peculiar and unusual facilities for its transaction. The grain is brought by the producer to local stations, where it is placed in elevators or sold to local buyers. It must then be shipped to terminal points, like Duluth or Minneapolis, to be there disposed of on the market. These great central markets are essential, not only for the preservation and storing of the grain in large quantities, but also in order that the business may be financed. At about the same time in each year great sums of money are required for this purpose, and it is stated that the banks of Minneapolis and Duluth furnish each year to the grain men from $40,000,000 to $50,000,000. This money, which is absolutely necessary for the moving of the crops, cannot be obtained unless the business is so organized and conducted as to minimize the risks resulting from fluctuating prices. Through these organizations the demoralization of prices of the products which constitute the basis of credits is prevented. These markets also enable parties operating elevator lines and purchasing large quantities of grain to sell for future delivery on each day substantially the amount of grain which they purchase at interior points, thus reducing the hazards of the business and enabling them to procure from financial institutions the funds necessary to move the crops.

The business of handling grain is of such a nature as to subject it to regulations which would be entirely unjustifiable if applied to a purely private business. It is because the business is of a quasi public nature that even the owner of a country elevator, who buys for himself alone and is his own grader and weighmaster, may be required to secure a license from the state. State v. W. W. Cargill Co., 77 Minn. 223, 79 N. W. 962; W. W. Cargill Co. v. Minnesota, 180 U. S. 452, 21 Sup. Ct. 423, 45 L. Ed. 619. For the same

reason the legislature may make a weighmaster's certificate prima facie evidence of what is stated therein. Vega S. S. Co. v. Consolidated El. Co., 75 Minn. 308, 77 N. W. 973, 43 L. R. A. 843, 74 Am. St. 484. It may also require all persons who sell grain on commission to take out a license and execute a bond for the protection of persons who deal with them. State v. Wagener, 77 Minn. 483, 80 N. W. 633, 778, 1134, 46 L. R. A. 442, 77 Am. St. 681; State v. Edwards, 94 Minn. 225, 102 N. W. 697, 69 L. R. A. 667. See generally State v. Brass, 2 N. D. 482, 52 N. W. 408; Brass v. North Dakota, 153 U. S. 391, 14 Sup. Ct. 857, 38 L. Ed. 757; American v. Chicago, 143 Ill. 210, 32 N. E. 274, 18 L. R. A. 190, 36 Am. St. 385; New York v. Board of Trade, 127 Ill. 153, 19 N. E. 855, 2 L. R. A. 411, 11 Am. St. 107. The fact that a business is affected with a public use does not, of course, exempt it from the operation of the anti-trust statute. But the general policy of the law, which requires uniformity of charges by persons engaged in such business, may well have a bearing upon the construction of the statute. These conditions, which are matters of general knowledge, must be taken into consideration in determining whether the legislature, when it enacted the anti-trust statute, intended to interfere with the well-understood workings of boards of trade and chambers of commerce, which had been organized under statutes designed to afford proper facilities for the marketing of grain and other produce.

The legislatures and courts recognize that such organizations serve a useful and proper purpose in modern business communities, and no disposition has been shown to unduly restrict the exercise of their corporate powers and functions. Evans v. Chamber of Commerce of Minneapolis, 86 Minn. 448, 91 N. W. 8; McCarthy Bros. Co. v. Chamber of Commerce of Minneapolis, 105 Minn. 497, 117 N. W. 923. The Duluth Board of Trade was organized long before the enactment of the anti-trust law, under a statute which expressly authorized such corporations. Both statutes were subsequently embodied in the revised laws. The anti-trust statute applies to all persons, associations, and corporations, and the members thereof; but it should not be construed so as to destroy or cripple a legitimate, legally authorized business, unless such clearly appears to have been

the legislative intention. But if the Duluth Board of Trade is transacting its business in a manner which is against the public policy of the state, it must change its methods or cease doing business. In order to determine what is forbidden by the statute, it is necessary to examine the common law and the statutes by which it has been declared and supplemented, as well as the construction which has been placed thereon by the courts. The evils sought to be remedied are general, and the statutes, national and state, are similar in purpose, though somewhat diverse in form.

4. To say that a combination restrains trade and prevents competition is a repetition of the same idea—the giving of two names to the same thing. Whatever restrains trade prevents competition, and whatever prevents competition in trade necessarily restrains trade. The word "monopoly," which plays so great a part in the law, conveys the same idea, because where there is monopoly there can be no competition. Production, and hence prices, are under the control of the monopolist, to the possible and probable injury of the public. Freedom of trade requires competition. Without one the other cannot exist, and whatever restrains the one restricts the other. It is true that unrestrained and unregulated competition may destroy what it it designed to preserve; but the theory of law and legislation still is that the welfare of the public requires that competition in trade and commerce shall exist, in order that freedom of trade may be maintained. To understand the language of the statute, it is necessary to know something of its history. The contract in restraint of trade, which originally fell under the condemnation of the common law, was one whereby a party bound himself not to follow some particular occupation, trade, calling, or profession, or to engage in some particular business for a period within a particular territory. From the earliest time the policy of the English law has been to discourage these voluntary restraints which tradesmen were induced to impose upon themselves, because they tended to deprive the community of the services of one of its members, and frequently tended to create a monopoly, and thus destroy the freedom of trade.

An early, and possibly the first, case in which a contract of this character was held void was decided during the reign of Henry

V. Year Book, 2 Hen. V (1415). It appeared that a dyer had bound himself not to exercise his trade for six months in the same town with the plaintiff. After holding the contract void, the court indignantly exclaimed: "Per Dieu! If the plaintiff were here, he should go to prison until he had paid a fine to the king!" In 1602, in Colgate v. Bacheler, 2 Cro. Eliz. 872, it was said that it was against the law "to prohibit or restrain any to use a lawful trade at any time, or at any place; for as well as he may restrain him for one time or one place, he may restrain him for longer times and more places, which is against the benefit of the commonwealth." The reasons assigned for the invalidity of such contracts were that they disabled a man from acquiring a livelihood, thus depriving the community of the benefit of his labor, and possibly requiring it to support him and his family, and had a tendency to give the covenantee a monopoly of the trade from which he had thus excluded one competitor, and by the same means might exclude others. In the leading case of Mitchel v. Reynolds, 1 P. Wms. 181, decided in 1711, Chief Justice Parker declared that the courts should not approve such contracts, because of the mischief which might arise from them to the party by the loss of his livelihood and the subsistence of his family, and to the public by reason of depriving it of a useful member, and also because they enabled parties to obtain exclusive advantages in trade by reducing it into as few hands as possible. These reasons are more fully stated by Mr. Justice Morton in Alger v. Thacher, 19 Pick. (Mass.) 51, 31 Am. Dec. 119.

All restraints of trade were then thought to be unlawful; but in the course of time it was found that so rigorous and far-reaching a rule seriously interfered with ordinary everyday business transactions, and it was gradually relaxed until it is now the law of England and America that contracts in partial restraint of trade are valid, when reasonably necessary to protect the legitimate interests of the covenantee. It must, however, be a restraint which, under all the circumstances and conditions, is reasonable, and, as said by Tindal, C. J., in Horner v. Graves, 7 Bing. 735: "We do not see how a better test can be applied to the question whether reasonable or not, than by considering whether the restraint is such only as to afford a fair protection to the interests of the party in

favor of whom it is given, and not so large 'as to interfere with the interests of the public." Nordenfelt v. Nordenfelt [1894] A. C. 535; U. S. v. Addyston Pipe & Steel Co., 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122; Oregon Steam Nav. Co. v. Winsor, 20 Wall. 64, 22 L. Ed. 315; Kronschnabel-Smith Co. v. Kronschnabel, 87 Minn. 230, 91 N. W. 892; National Benefit Co. v. Union Hospital Co., 45 Minn. 272, 47 N. W. 806, 11 L. R. A. 437; Gibbs v. Consolidated Gas Co., 130 U. S. 396, 9 Sup. Ct. 553, 32 L. Ed. 979; Diamond Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. 464. As stated in a recent English text-book: "The sole test of the validity of a contract in restraint of trade is its reasonableness in the interest of the covenantee", subject to the proviso that "the covenant must not otherwise offend against public policy." Matthews & Adler, Restraint of Trade, c. 2, p. 39 (1907).

If a contract is unreasonable according to this test, it is invalid at common law; and this, in the particular case, may be because of either or both of the reasons given by the judges in the earlier cases. It restricts the freedom of the individual, limits his capacity to utilize his labor and skill for the benefit of himself, his family, and the public, and prevents him from competing with the covenantee in the trade or business from which he is excluded, to the injury of the public, which is deprived of the benefits which result from the freedom of trade. But, as said by Judge Taft, in U. S. v. Addyston Pipe & Steel Co., 54 U. S. App. 723, 85 Fed. 271, 282, 29 C. C. A. 141: "Where the sole object of both parties in making the contract as expressed therein is merely to restrain competition, and enhance or maintain prices, it would seem that there was nothing to justify or excuse the restraint,—that it would necessarily have a tendency to monopoly, and therefore would be void. In such a case there is no measure of what is necessary to the protection of either party, except the vague and varying opinion of judges as to how much, on principles of political economy, men ought to be allowed to restrain competition. There is in such contracts no main lawful purpose, to subserve which partial restraint is permitted, and by which its reasonableness is measured. but the sole object is to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster."

We have, then, two distinct kinds of contracts which the common law recognized as in restraint of trade: (1) Contracts per se in restraint of trade, whereby an individual contracts himself out of a trade; and (2) contracts which tend to destroy competition and thus create monopolies. Northern Securities Case, 193 U. S. 197, 403, 24 Sup. Ct. 436, 48 L. Ed. 679. The validity of the first class is determined by the reasonableness of the particular contract, while the second class are against public policy and invalid because of their tendencies, without reference to their reasonableness. The former are generally, if not always, ancillary to a valid principal contract, and, although technically in restraint of trade, are not within the purview of the anti-trust statute. Cincinnati, P., B. S. & P. Packet Co. v. Bay, 200 U. S. 179, 26 Sup. Ct. 208, 50 L. Ed. 428; A. Booth & Co. v. Davis (C. C.) 127 Fed. 875; Espenson v. Koepke, 93 Minn. 278, 279, 101 N. W. 168. See Shawnee Compress Co. v. Anderson, 209 U. S. 423, 28 Sup. Ct. 572, 52 L. Ed. 865.

The contracts or agreements in restraint of trade which fall under the condemnation of the anti-trust statute are of the second class, and are contrary to public policy because they have a tendency to prevent competition in trade and commerce. The Englishmen of the 1400's, blindly groping for some means of protecting themselves from unconscionable traders, adopted what now seems the absurd device of prohibiting entirely the buying and selling of certain articles for profit. They desired, if possible, to be free to deal with tradesmen who were themselves free to buy and sell without restraint. They therefore made the buying up large quantities of corn and other victuals with the intent to sell them again an indictable offense, because this of course must be injurious to the public by putting it in the power of one or two rich men to raise the price of provisions at their own discretion. It will be observed that this act applied to victuals and breadstuffs only, but St. 5 & 6 Edw. VI, c. 14, made criminal the buying or contracting for any merchandise or victuals coming on the way to markets, or dissuading persons from buying their goods there, or persuading them to enhance the price when there, any of which practices makes the market dearer to the fair trader. 3 Stephen, History Crim. Law

of England, 199, et seq. The owners of certain salt works were charged with raising the price of salt, and Lord Mansfield, in granting a motion to file an information against them for conspiracy, said: "If an agreement was made to fix the price of salt or any other necessity of life by people dealing in that commodity, the court would be glad to lay hold of an opportunity, from what quarter whatsoever the complaint came, to show them the sense of the crime, and that what rate soever the price was fixed, high or low, made no difference, for all such agreements are of bad consequence and ought to be discontinued." See Central v. Guthrie, 35 Oh. St. 666, 672. The act thus commented upon by Lord Mansfield is forbidden by modern anti-trust statutes, and expressly by the second part of the Minnesota statute. The old offenses of regrating, engrossing, and forestalling are no longer known to the law; but modern legislatures are still seeking a solution of the same problem—how to maintain the right to freely buy and sell the necessaries and conveniences of life in a market which is free from artificial and conventional restrictions.

More objectionable, because more far-reaching and detrimental to the public interests, were the special privileges enjoyed under grants from the crown, which were known as "monopolies." The technical monopoly, as distinguished from the practical monopoly of modern times, was a license or privilege, granted by the sovereign, to an individual for the sole buying and selling, making, working, or using, of anything whatsoever whereby the people in general were excluded from the liberty of manufacturing and trading, which they had before enjoyed. In 1 Hawkins, Pleas of the Crown (6th Ed.) 470, § 1, c. 79, a monopoly is defined as "an allowance by the king, to any person or persons, of the sole buying, selling, making, working, or using of anything, whereby any person is sought to be restrained from any freedom which he had before, or hindered from his lawful trade." It differed from engrossing only in that in the case of monopoly a patent was had from the king, while engrossing was a transaction between individuals. 4 Blackstone, Com. 159; 3 Coke, Inst. 181; Leeper v. State, 103 Tenn. 500, 53 S. W. 962, 48 L. R. A. 167.

The practice of granting privileges of this character has been common in all countries, and still survives to a limited extent even in this country. The abuse of the power by Queen Elizabeth so stirred the people to righteous wrath and indignation that "the coach of the chief minister of the crown was surrounded by an indignant populace, who cursed the monopolies and exclaimed that the prerogative should not be suffered to touch the old liberties of England." 1 Macaulay, History of England, 50. In the Long Parliament Sir John Culpeper bitterly declared that the monopolists are "a nest of wasps or swarm of vermin, which have overcrept the land. * * * These like the frogs of Egypt have gotten the possession of our dwellings, and we have scarce a room free from them. They sup in our cup, they dip in our dish, they sit by our fire. We find them in the dye-fat, washboul, and powdering-tub. They share with the butler in his box. * * * Mr. Speaker, they will not bait us a pin. We may not buy our own cloaths without their brokage. These are the leeches that have sucked the commonwealth so hard that it is almost hectical. Mr. Speaker, I have echoed to you the cries of the kingdom. I will tell you their hopes. They look to Heaven for a blessing upon this parliament." As early as 1602 it was held in Darcy v. Allein (Case of Monopolies) Coke, pt. 11, 84b (1602), that such monopolies were void at common law. Darcy had been granted the exclusive right to make, import, and sell playing cards within the realm. The court held the grant void, because it was a monopoly and against the common law, for reasons which, when carefully analyzed, seem to reduce themselves to the single one that monopolies prevent competition and thus control prices. In 1625 Parliament by St. 21 James I, c. 3, forbade the granting of monopolies save in certain specified cases. Earl of Yarmouth v. Darrel, 3 Mod. 75; East-India Co. v. Sandys, Skinner, 132; 10 How. St. Tr. 371 (1684). Elaborate and instructive discussions of the history and nature of monopolies will be found in the opinions of Mr. Justice Story in Charles River Bridge v. Warren Bridge, 11 Pet. 420, 9 L. Ed. 773, and Mr. Justice Field in the Slaughter-House Cases, 16 Wall. 36, 21 L. Ed. 394, and in Senator Nelson's report on the proposed amendment of the Sherman act, Report No. 848, 60th Cong. 2d Sess. (1909).

· The modern monopolies, against which the legislatures, courts, and people inveigh, are generally such as result indirectly from the legislative grant of some exclusive privilege, or the right to carry on a business which is dependent upon the existence· of some special privilege or franchise.  A practical monopoly may exist without the aid of a legislative grant, as it may result from the control of a trade or industry, brought about by means of contracts and combinations between competitors.  In the modern sense, and within the meaning of the federal statute and the constitution and statute of Minnesota, trade and commerce are monopolized "when, as a result of efforts to that end, previously competing businesses are so concentrated in the hands of a single person or corporation, or a few persons or corporations acting together, that they have power to practically control the prices of a commodity and thus to practically suppress competition."  Noyes, Intercorp. Rel. (2d Ed.) § 389, and cases cited; National Cotton Oil Co. v. Texas, 197 U. S. 115, 129, 25 Sup. Ct. 379, 49 L. Ed. 689 (McKenna, J.).  Like the ancient monopolies, the practical monopoly is under the ban of the law because it tends to prevent competition and enhance the price or deteriorate the quality of the commodity or service to which it relates.  National Cotton Oil Co. v. Texas, supra; Butchers' Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. H. Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585; Harding v. American, 182 Ill. 551, 55 N. E. 577, 64 L. R. A. 738, 74 Am. St. 189.

From these analogous acts, which were illegal at common law, and under the English statutes, which became a part of the common law, it appears that the purpose in all the prohibitions was to preserve the freedom of trade by means of free competition between the traders themselves, in order that the public should not be required to pay exorbitant prices for articles of common use and necessity.  It was to prevent any man or set of men from possessing the power to arbitrarily. determine the price at which an article of common use shall be sold, because he who controls prices is the master of the world.  The well-being of the trader, and the indirect benefit to the community through his activities, was also an important factor; but much of the solicitude for the individual which was manifested in the early decisions seems unnecessary to modern

107 M.—34

eyes, and plays a minor part in modern cases, which are determined by the test of public policy.

At common law contracts in restraint of trade were not unlawful in the sense of being criminal, nor did their breach give rise to a civil action. They were simply unenforceable. U. S. v. Addyston Pipe & Steel Co., supra; Mogul v. McGregor [1892] A. C. 25; Hornby v. Close, L. R. 2 Q. B. 153. Such contracts could not be enforced, nor could monopolies be legally enjoyed; but neither the making of the one nor the acquiring and enjoying of the other was a crime. A conspiracy to create a monopoly in commodities which constitute the necessities of life, or to enhance the market price therof, to the prejudice of the consumer, was and is a criminal offense at common law. See Morris v. Barclay, 68 Pa. St. 173, 8 Am. 159; Richardson v. Buhl, (Diamond Match Co.) 77 Mich. 632, 43 N. W. 1102, 6 L. R. A. 457; Nester v. Continental Co., 161 Pa. St. 473, 29 Atl. 102, 24 L. R. A. 247, 41 Am. St. 894; Chicago v. People, 114 Ill. App. 75; Pocahontas v. Powhatan, 60 W. Va. 508, 56 S. E. 264, 10 L. R. A. (N. S.) 268, 116 Am. St. 901; People v. Fisher, 14 Wend. 9, 28 Am. Dec. 501; People v. Milk Exchange, 145 N. Y. 267, 39 N. E. 1062, 27 L. R. A. 437, 45 Am. St. 609; American Biscuit & Mnfg. Co. v. Klotz (C. C.) 44 Fed. 723; People v. Sheldon, 139 N. Y. 251, 34 N. E. 785, 23 L. R. A. 221, 36 Am. St. 690; Harding v. American, 182 Ill. 551, 615, 55 N. E. 577, 64 L. R. A. 738, 74 Am. St. 189. A very complete collection of cases decided on common-law principles will be found in notes in 11 Am. Ry. & Corp. Rep. 388, 445, and 474 (1895). See also Noyes, Intercorp. Rel. (2d Ed.) cc. 35, 36.

5. The common-law rules were sufficient under ordinary conditions to protect the public and yet leave ample freedom for legitimate business transactions. But the astonishing material development of this country, with its opportunities for exploitation and the acquisition of great wealth, produced conditions which the common law, with its inadequate remedies, seemed unable to control. Competition was rapidly being eliminated from the business situation, with the result that the prices of most of the articles of everyday use were determined arbitrarily by men who controlled their

production and distribution, instead of by the laws which are supposed to operate when trade and commerce is free from artificial restraints. These abuses led to the enactment of a series of statutes which are popularly known as "anti-trust statutes."

(a) The most important of these, because of the nature and magnitude of the interests affected, is the Sherman anti-trust statute of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies." (26 St. 209, c. 647). Its terms are very general, and its prohibitions are against (1) contracts and combinations in restraint of trade and (2) attempts to monopolize trade or any part thereof. Section 1 provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal" and punishable as a crime. Section 2 provides that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor." The statute is made applicable to the District of Columbia and the territories, and its enforcement is provided for through criminal proceedings and the injunctional power of the courts. Individuals who are injured by reason of a violation of this statute are given a remedy by way of damages against the wrongdoer. To aid in its enforcement congress has enacted statutes providing for the prompt hearing of suits in equity instituted by the government and providing for special officers with ample funds under their control. U. S. Comp. St. 1901, 3200, et seq.; U. S. Comp. St. Supp. 1903, 376; Id. 366, 367. See also the anti-trust provision of the Wilson tariff act (Act August 27, 1894, c. 349, §§ 73–77, 28 St. 570 [U. S. Comp. St. 1901, 3202, 3203]) and the immunity proviso of Appropriation Act Feb. 25, 1903, c. 755, 32 St. 904 (U. S. Comp. St. Supp. 1907, 884).

The validity of the Sherman act as an exercise of the power to regulate commerce was sustained in the Joint Traffic Assn. Case, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259. It embraces only agreements and combinations and acts which have direct connec-

tion with interstate and foreign commerce; but such commerce comprehends intercourse for all the purposes of trade, in any and all its forms, including the transportation, purchase, sale, and exchange of commodities between citizens of different states, and the power to regulate it embraces all the instrumentalities by which such commerce is conducted. Addyston Pipe & Steel Co. v. U. S., supra; Hopkins v. U. S., 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290. Its prohibitions are broader than those of the common law against restraints of trade. Trans-Missouri Freight Assn. Case, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488; Continental Wall Paper Co. v. Lewis Voight & Sons, 148 Fed. 939, 78 C. C. A. 567. It has therefore been held to apply to railroads and other public service corporations, and to prohibit all combinations or acts which cause restraint of interstate commerce, whether such restraint is reasonable or unreasonable. U. S. v. Trans-Missouri Freight Assn., 166 U. S. 290, 328, 17 Sup. Ct. 540, 41 L. Ed. 1007; Northern Securities Co. v. U. S., 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679; Pocahontas v. Powhatan, supra. It makes no distinction between classes of persons, and applies to combinations of laborers as well as capitalists. Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488. A combination to restrain a part of interstate commerce, whether reasonable or unreasonable, is as illegal as a successful monopolization of the whole of interstate commerce. The statute prohibits "any combination whatever to secure action which essentially obstructs the free flow of commerce between the states, or restricts, in that regard, the liberty of a trader to engage in business." Loewe v. Lawlor, supra. As construed by the circuit court of the second circuit, it makes illegal every combination by which competition is ended or suspended between two or more persons engaged in interstate or foreign trade or commerce. "Disregarding various dicta" said Judge Lacombe, "and following the several propositions which have been approved by successive majorities of the supreme court, this language is to be construed as prohibiting any contract or combination whose direct effect is to prevent the free play of competition, and thus tend to deprive the country of the serv-

ices of any number of independent dealers however small." U. S. v. American Tobacco Co. (C. C.) 164 Fed. 700, 701.

The following combinations and agreements have been held illegal under the Sherman law: An agreement between certain railroad companies which provided for establishing and maintaining, for their mutual protection, reasonable rates, rules, and regulations in respect to freight traffic, through and local, and by which free competition between these companies was restricted. U. S. v. Trans-Missouri Freight Assn., supra. An arrangement between certain railway companies with reference to railroad traffic among the states, under which the railroads were not subject to competition among themselves, even though the contracts were in themselves reasonable. U. S. v. Joint Traffic Assn., supra. An agreement between certain private companies and corporations engaged in different states in the manufacture, sale, and transportation of iron pipe, whereby competition among them was avoided. Addyston Pipe & Steel Co. v. U. S., supra. A combination created by an agreement between certain dealers in tiles, grates, and mantels in different states, whereby they controlled, or sought to control, the prices of such articles in these states. Montague & Co. v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608. A combination of publishers and booksellers to fix prices and compel publishers and dealers, by means of rewards and punishments, to sell at the prices so fixed. Bobbs-Merrill Co. v. Straus (C. C.) 139 Fed. 155. See Scribner v. Straus (C. C.) 139 Fed. 193.

A contract or agreement whereby a holding corporation was created, to which the stockholders of competing parallel lines of railways, contrary to the laws of the state which created the competing companies, agreed to transfer the stock of both roads, was prohibited by the Sherman act, because it tended to destroy competition among carriers and create a monopoly of the traffic. Northern Securities Co. v. U. S., supra. In the so-called Beef Trust case it was alleged that the defendants were guilty of the following acts: (a) Directing their purchasing agents to refrain from bidding against each other at auction sales of live stock; (b) bidding up the price of such stock for a few days at a time, to influence large shipments, and then ceasing to bid in order to obtain the stock thus shipped at less than

prevailing prices; (c) agreeing upon prices to be adopted by all, and restraining the output or quantity of meat shipped; (d) directing uniform prices for cartage and delivery throughout the United States as a device to increase the price to dealers and consumers; and (e) negotiating with carriers for secret rebates on their enormous shipments, thus bringing about unjust discrimination against other shippers and competitors, for the purpose of stifling and destroying competition. It was held on demurrer that these acts constituted an unlawful combination and conspiracy within the meaning of the Sherman act, because in restraint of trade and commerce. U. S. v. Swift & Co. (C. C.) 122 Fed. 529, affirmed Swift & Co. v. U. S., 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518.

The owner of a patented article may impose restrictions upon its manufacture and sale, and, if the conditions are otherwise not illegal, they will not violate the Sherman act, even though the tendency is to restrain trade. The very object of the patent laws is to create monopoly. Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058. But where the patentee went beyond the rights secured by the patent, in raising and maintaining prices in states where the patent had no practical existence, the contract was held forbidden by the Sherman act. Rubber Tire Wheel Co. v. Milwaukee Rubber Works Co. (C. C.) 142 Fed. 531, but see 154 Fed. 358. Contracts under which a board of trade furnishes stock quotations under certain conditions are not in restraint of trade at common law or under the Sherman act. Board of Trade of City of Chicago v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031.

(b) The federal anti-trust act necessarily applied only to contracts, combinations, and conspiracies in restraint of interstate and international trade and commerce, and soon after its passage the states began to enact similar statutes for the purpose of reaching agreements and combinations which were beyond the reach of the federal power. Waters-Pierce Oil Co. v. Texas, 177 U. S. 28, 20 Sup. Ct. 518, 44 L. Ed. 657, and National Cotton Oil Co. v. Texas, 197 U. S. 115, 25 Sup. Ct. 379, 49 L. Ed. 689, sustain the power of the states to enlarge the common-law rules and prohibit combinations in restraint of trade within their borders, when such com-

binations limit competition in the production or sale of articles, or increase or reduce prices in order to prevent free competition.. The authority to pass such laws arises out of the police power. In Smiley v. Kansas, 196 U. S. 447, 456,. 25 Sup. Ct. 289, 49 L. Ed. 546, the court, in sustaining the Kansas statute, said: "A secret arrangement, by which, under penalties, an apparently existing competition among all the dealers in a community in one of the necessaries of life is substantially destroyed, without any merging of interests through partnership or incorporation, is one to which the police power extends."

Anti-trust statutes of the same general character, although differing somewhat in scope and detail, are now in force in Arkansas (Act March 16, 1897, p. 60; Act March 6, 1899, p. 50); California (section 1673, Civ. Code; chapter 530, p. 984, St. 1907); Florida (chapter 4534, p. 60, Laws 1897, confined to beef and meats); Georgia (Laws 1896, p. 68); Illinois (Laws 1907, p. 216, amending Laws 1891, p. 206, and Laws 1893, p. 89, which were declared unconstitutional in Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679); Indiana (chapter 243, p. 490, Laws 1907; chapter 148, p. 257, Laws 1899); Iowa (Code, §§ 5060–5062); Kansas (Act March 8, 1897, p. 481, c. 265, sustained in Smiley v. Kansas, 196 U. S. 447, 25 Sup. Ct. 289, 49 L. Ed. .546); Kentucky (Ky. St. §§ 3915–3921 [Russell's St. §§ 3717–3723]); Louisiana (Act July 7, 1892, p. 120, No. 90; Const. art. 190); Maine (R. S. 1903, c. 47, §§ 53–55); Massachusetts (chapter .454, p. 409, Laws 1908); Michigan (Act No. 255, p. 409, Pub. Acts 1899); Minnesota (R. L. 1905, §§ 2098, 5168; chapters 252, 269, pp. 342, 363, Laws 1907); Missouri (Laws 1891, p. 186; R. S. 1899, §§ 8965–8977 [Ann. St. 1906, pp. 4150–4156]); Montana (Pen. Code 1895, c. 8, §§. 321, 325 [Rev. Codes, §§ 8285, 8289]); Nebraska (chapter 79, p. 347, Laws ·1897); North Carolina (chapter 218, p. 254, Pub. Laws 1907); Oklahoma (chapter 83, p. 750, Laws 1907); New York (chapters 690, 727, pp. 1514, 1558, Laws 1899; Pen. ·Code, § 168); North Dakota (Rev. Codes 1899, §§ 7480–7484); Ohio (Bates' Ann. St. 1904, § 4427–1); South Carolina (Act Feb. 26, 1902 [23 St. at Large, p. 1057]); South Dakota (chapter 131, p. 196, Laws 1907; Rev. Pen. Code 1903, §§ 770–781); Tennessee

(Act March 30, 1891, p. 428, c. 218; Act April 30, 1897, p. 241, c. 94); Texas (Laws 1907, p. 16, c. 12; Id. p. 194, c. 97; Id. p. 221, c. 120; Id. p. 322, c. 173, and chapter 10, p. 456, Laws 1st called Sess. 1907). The former statute was sustained in Waters-Pierce Oil Co. v. Texas, 177 U. S. 28, 20 Sup. Ct. 518, 44 L. Ed. 657; National Cotton Oil Co. v. Texas, 197 U. S. 115, 25 Sup. Ct. 379, 49 L. Ed. 689; Utah (R. S. 1898, §§ 321, 1758;. Const. art. 12, § 20); Wisconsin (chapter 219, p. 264, Laws 1893; St. 1898, §§ 1747e–1747g, 1791j). A convenient summary of these statutes will be found in Noyes, Intercorp. Rel. (2d Ed.) c. 41. The constitutions of Idaho (article 11, § 18), Kentucky (section 198), Louisiana (article 190), Maryland (Declaration of Rights, § 41), Minnesota (article 4, § 35), Montana (article 15, § 20), Utah (article 12, § 20), Washington (article 12, § 22), Wyoming (article 10, § 8), and Oklahoma (article 5, § 44), contain provisions concerning monopolies and trusts. See Stimson, Federal & State Const. § 580.

These statutes vary somewhat in their terms, and many cases have been decided under them. A reference to a few of the decisions will serve to illustrate the construction which has been placed upon the statutes by the state courts. The following have been held prohibited by the statutes:

A combination between corporations engaged in carrying freight and passengers by boat between points in different states, the purpose of which was to create a monopoly in the traffic. White Star Line v. Star Line, 141 Mich. 604, 105 N. W. 135, 113 Am. St. 551 (applies Sherman act). A contract whereby one party agrees to remain out of business, which is broader than is necessary to protect the covenantee, and which tends to restrain trade and create a monopoly. Anderson v. Shawnee, 17 Okl. 231, 87 Pac. 315, 15 L. R. A. (N. S.) 846, affirmed 209 U. S. 403, 28 Sup. Ct. 572, 52 L. Ed. 865. A contract having for its object the fixing and control of the price of farm machinery. International v. Com., 124 Ky. 543, 99 S. W. 637. An agreement whereby a corporation secured the exclusive right and privilege of marketing the products of the American Tobacco Company in New York City, the company controlling ninety per cent. of the tobacco business of the United States, the effect of which is to destroy competition. Locker

v. American, 121 App. Div. 443, 106 N. Y. Supp. 115. A series of agreements whereby substantially all the building contractors of a particular locality agreed to buy brick exclusively from certain specified manufacturers, and by which the latter agreed to sell brick to such contractors only, and by which all the bricklayers in such locality agreed to handle only the brick of such manufacturers, obtained through such contractors; the purpose being to prevent competition and control the price of brick. Purington v. Hinchliff, 120 Ill. App. 523. The purchase by one corporation of the majority of the stock of another corporation for the purpose of controlling the latter and preventing competition. Dunbar v. American, 224 Ill. 9, 79 N. E. 423. It is immaterial that it would not result in a complete monopoly—citing People v. Chicago, 130 Ill. 268, 22 N. E. 798, 8 L. R. A. 497, 17 Am. St. 319; Distilling v. People, 156 Ill. 448, 41 N. E. 188, 47 Am. St. 200; Bishop v. American, 157 Ill. 284, 41 N. E. 765, 48 Am. St. 317; Harding v. American, 182 Ill. 551, 55 N. E. 577, 64 L. R. A. 738, 74 Am. St. 189. An agreement that all salt shall be purchased from a designated company for the period of two years, in connection with an agreement not to import salt and to discourage shipments by other parties. Getz v. Federal Salt Co., 147 Cal. 115, 81 Pac. 416, 109 Am. St. 114. A contract limiting the quantity of fish to be caught during the season. Attorney General v. Booth, 143 Mich. 89, 106 N. W. 868. A combination, the tendency and manifest intent of which was to prevent general competition, and thus control trade in a commodity and enable the members of the combination to dictate prices. "The ultimate object of the combination was to give to its members a monopoly in the retail coal business in their respective localities, thus enabling them to regulate prices independent of legitimate and healthful competition." Sanford v. People, 121 Ill. App. 619, 646. "All the cases, ancient and modern, agree that a combination, the tendency of which is to prevent general competition and to control prices, is detrimental to the public and consequently unlawful." People v. North River, 2 L. R. A. 33, 40.

The Texas statute (Laws 1903, p. 119, c. 94), prohibiting trusts and defining a trust as a combination of capital, skill, or acts of two or more persons to create or carry out restrictions in the free pursuit of any business authorized by the laws of the state, or to prevent or lessen com-

petition in transportation, was held to be violated by a contract between a railway company and an express company, whereby the latter was given exclusive privileges and the former bound itself not to contract with others to do an express business on the road, and that, if privileges should be accorded others by legislative or judicial proceedings, the express company should have credit for the sums paid by the other corporations. "The contract in question shows by its own terms, that its purpose was to secure to the express companies, as far as it was in the power of the parties to do so, the exclusive right to do an express business upon the railroad, and to exclude other express companies from the enjoyment of like rights. * * * We conclude that there was the purpose to create and carry out a restriction in the free pursuit of a business," and that it was a combination of the capital, skill, and acts of both corporations. State v. Missouri, 99 Tex. 516, 526, 91 S. W. 214, 5 L. R. A. (N. S.) 783.

The Michigan statute (Act No. 255, p. 409, Pub. Acts 1899), which made it unlawful to contract not to sell any commodity below a fixed value, or to keep the price of an article at a fixed figure, or to settle the price of any article so as to prevent competition, or to combine or unite any interest connected with the sale of any commodity that its price may be affected, made illegal a contract, embodied in the rules of a master plumber's club, which provided that the price of supplies should be fixed by a committee, at which price all were to sell to the members of the exchange. The tendency was to create monopoly, and the court said: "It is no answer to say that this monopoly has in fact reduced the price. * * * That policy may have been necessary to crush competition. The fact exists that it rests in the discretion of this company at any time to raise the price to an exorbitant degree." Richardson v. Buhl, 77 Mich. 632, 660, 43 N. W. 1102, 6 L. R. A. 457; Hunt v. Riverside, 140 Mich. 538, 104 N. W. 40, 112 Am. St. 420.

The Nebraska statutes (chapter 114, p. 675, Laws 1887, and chapter 80, p. 352, Laws 1897), which prohibit combinations of grain dealers to fix the price of grain, do not exempt such dealers from the general anti-trust statute. State v. Omaha, 75 Neb. 637, 106 N. W. 979, 110 N. W. 874. The statutes forbid a combination to control and limit the price of milk. (Ford v. Chicago, 155 Ill. 166, 39 N. E. 651, 27 L. R. A. 298), a combination to control the price of beer (Houck v. An-

heuser-Busch, 88 Tex. 184, 30 S. W. 869; Nester v. Continental, 161 Pa. St. 473, 29 Atl. 102, 24 L. R. A. 247, 41 Am. St. 894), a combination to fix the price of meats (State v. Armour, 173 Mo. 356, 73 S. W. 645, 61 L. R. A. 464, 96 Am. St. 515), a combination of merchants to compel another to sell goods at a price fixed by it (Brown v. Jacobs, 115 Ga. 429, 41 S. E. 553, 57 L. R. A. 547, 90 Am St. 126), a combination to control the production and fix the price of petroleum and its products (State v. Buckeye, 61 Oh. St. 520, 56 N. E. 464), an agreement among competing grain dealers that each will account, at so much per bushel, for all grain bought by him in excess of an allotted share (State v. Smiley, 65 Kan. 240, 69 Pac. 199, 67 L. R. A. 903), an agreement whereby a builder is to add a percentage to his bid and give it to an association of which he is a member (Milwaukee v. Niezerowski, 95 Wis. 129, 70 N. W. 166, 37 L. R. A. 127, 60 Am. St. 97), an agreement between an association of master plumbers and a manufacturer to buy only from such manufacturer (Bailey v. Master Plumbers, 103 Tenn. 99, 52 S. W. 853, 46 L. R. A. 561), and an agreement between such an association and a manufacturer that the latter will sell only to the association (Walsh v. Association, 97 Mo. App. 280, 71 S. W. 455). See Kosciusko v. Wilson, 90 Miss. 551, 43 South. 435, 8 L. R. A. (N. S.) 1053; Central v. Guthrie, 35 Oh. St. 666.

Many attempts have been made to bring unobjectionable transactions within these statutes, and a reference to some of the cases will serve to show the proper scope of the prohibitions. A contract not to sell any other whiskey of the same brand in the place where the buyer was engaged in business until the buyer had disposed of the quantity purchased was held not in violation of the Texas act of 1899 (Acts 1899, p. 246, c. 146), which prohibited agreements to fix or regulate the price of any article, to maintain such price when fixed, or to limit or fix the amount or quantity of any article. Norton v. Thomas, 99 Tex. 578, 91 S. W. 780. This statute was held not to condemn a contract whereby a sleeping car company was to furnish sleeping cars for a railroad company, and in which the only reference to prices was the stipulation that the sleeping car company might charge passengers on its cars on the trains of the railway company such fares as were customary on competing lines of railway where equal accomodations were furnished. No one had a right to run cars on the railroad, and there-

fore "the free pursuit of any business authorized or permitted by law" was not restricted. The contract in no way interfered with the rights of any other sleeping car company, if any existed, to build and furnish its cars to railway companies. Ft. Worth v. State, 99 Tex. 34, 87 S. W. 336, 70 L. R. A. 950.

An agreement between a carrier and an association of citizens for special rates on excursion tickets does not violate either the state or federal anti-trust statutes. Lytle v. Galveston, 100 Tex. 292, 99 S. W. 396, 10 L. R. A. (N. S.) 437. In Hartz v. Eddy, 140 Mich. 479, 103 N. W. 852, it was held that a certain lease was not a part of the plan of a salt trust to limit the production of salt, raise the price thereof, and create a monopoly. In State v. Virginia-Carolina, 71 S. C. 544, 51 S. E. 455, it was held that the anti-trust statute should be construed to mean that the contract is against public policy when made with a view to lessen, or which tends to lessen, full and free competition to an unreasonable extent. In Wood v. Greenwood, 75 S. C. 378, 382–384, 55 S. E. 973, 9 L. R. A. (N. S.) 501, it was said: "A construction of the statute which would make obnoxious every contract which tends in any measure to affect the cost or price of articles to the producer or consumer * * * would probably render the statute liable to the objection that it unnecessarily and unreasonably abridges the freedom of contract guaranteed by the State and Federal constitutions. * * * In determining whether a particular contract falls within the inhibition of the statute, the court must necessarily consider the tendency or power of the contract to injure the public, either considered in itself or as part of a scheme to destroy or impede competition and control supply and prices. A contract may be lawful in itself as an isolated matter but yet be unlawful as a part of a scheme to create a virtual monopoly. * * * Every case, however, alleged to fall within the statute must be controlled by its own peculiar facts and circumstances, and we will not attempt to state any hard and fast rule by which every case must be governed. The main general test should be whether the contract, trust or combination is monopolistic in purpose or natural tendency. If so, it unreasonably affects competition and prices to the detriment of the public and is obnoxious to the statute." It appeared that a New York corporation had entered into a contract with a South Carolina corporation whereby the latter bound

itself to sell certain articles for use only in G. and vicinity, to canvass the territory named for purchasers, and not to accept the agency for or sell similar articles during the term of the contract. The other party agreed to manufacture the articles and sell them to the South Carolina corporation, and to use reasonable diligence to prevent other agents from making sales of similar articles within the territory. This was held a minor contract in partial restraint of trade only, and not tending to prevent competition and restrain trade.

The rules of a live stock exchange, which provided for the expulsion of members who were guilty of commercial dishonesty, and forbade members from having any further commercial transactions with the person who had been expelled, were held not within the inhibition of the statute. The exchange, said the court, "does not seek to limit trade, nor to limit competition by refusing to buy from or sell to others for the reason that they are not members of its association. But they can boycott a member—or, rather, they can refuse to deal with him, not because he is not a member of the exchange, but because he has been found guilty and expelled from the association for his wrongdoing." Gladish v. Kansas City, 113 Mo. App. 726, 732, 89 S. W. 77. The case was distinguished from Heim v. Belinder, 97 Mo. App. 64, 71 S. W. 691, where certain brewers had an agreement that they would not sell to any one indebted to either of the others for beer until he had paid that debt. An agreement of that character, it was said, "tended to establish a monopoly, deprive the debtor of the benefit of competition, and to impose a penalty on his condition which was forbidden by the statute against trusts and pools." "The object of the statute" said the court in the Gladish case (page 733), "is to promote the public welfare, and not to outlaw harmless combinations, or those which are beneficial in their nature. This statute, like every other, should receive a reasonable construction. The purposes of the exchange are to be commended"—citing Haebler v. New York, 149 N. Y. 414, 44 N. E. 87; American v. Chicago, 143 Ill. 210; Board of Trade v. Nelson, 162 Ill. 431, 44 N. E. 743, 53 Am. St. 312; Belton v. Hatch, 109 N. Y. 593, 17 N. E. 225, 4 Am. St. 495. Of a contract by which one corporation bound itself to buy all its raw material from and sell all its manufactured products to another the court said: "We do not regard this contract as one in restraint of trade and, therefore,

illegal and void. Nor do we think it is forbidden by the anti-trust law of this state, or by the Sherman act. There is neither allegation nor evidence here that this contract tended to produce a monopoly, or was in restraint of trade, or enabled the parties thereto, or either of them, to monopolize the market, or that it had anything to do with commerce." Heimbuecher v. Goff, 119 Ill. App. 373, 379.

The anti-trust statute does not affect a contract made by a seller of grain to sell to purchasers a certain amount of grain to be delivered in the future. Albers v. Spencer, 205 Mo. 105, 103 S. W. 523, 11 L. R. A. (N. S.) 1003. A contract to run for eight years, whereby an owner of a bed of fire clay agreed to erect a plant and operate it, and several corporations agreed to take a specified amount of the product daily at a fixed price—the first party agreeing not to operate a fire clay plant on any other land owned or controlled by him in the state, and the second party agreeing not to sell brick to any other parties, and the latter not to buy of any other party in the state, and not to enter into any combination or trust to limit the output of the plant is not invalid under the statute. After quoting the Illinois statute, Mr. Justice Wilkin said: "The object of these statutes is to prohibit the formation of trusts and combinations and remove all obstructions in restraint of trade and free competition. It was not the purpose of either law to hinder or prohibit contracts on the part of corporations or individuals made to foster or increase trade or business. But a contract may incidentally restrain competition or trade without violating the statutes if its chief purpose is to promote and increase the business of those who enter into it." The contract was regarded as one in partial restraint of trade only. Southern v. Garden, 223 Ill. 616, 621, 79 N. E. 313.

In Yazoo v. Searles, 85 Miss. 520, 37 South. 939, 68 L. R. A. 715, a car service association was held not to be a trust within the meaning of the statute of that state. This decision contains a very full discussion of the general subject. It was said that, in construing anti-trust statutes, the nature of the business contemplated by the contract and the tendency of the contract as affecting the public should be considered, rather than the interests of the parties to the particular contract. But the design of the legislature was to protect the public, not to unnecessarily restrict the transacting of business by either corporations

or individuals. "The various kinds of legitimate business rendered necessary by the multiform demands of public convenience, the manifold callings which are an incident of this progressive age, all demand that the individual right of contract shall be given full sway, conditioned only that the rights of the public and the welfare of the people and the public policy of the state shall be held sacred. * * * The result desired—the purpose of the entire legislation—was to suppress trusts, secure the benefits arising from competition in trade, prevent monopolies, and protect the people from the possible tyranny and oppression of combined wealth."

A contract for the sale of the entire output of sash weights of a particular foundry at a specified price, and obligating the seller to withdraw a former lower price, is not invalid. Combinations between individuals or firms for the regulation of prices or competition in business are held not to be monopolies and in restraint of trade so long as they are reasonable and do not include all the commodity or trade, or to create such restrictions as to materially affect the freedom of commerce. Over v. Byram, 37 Ind. App. 452, 77 N. E. 302, 117 Am. St. 327; Herriman v. Menzies, 115 Cal. 16, 44 Pac. 660, 46 Pac. 730, 35 L. R. A. 318, 56 Am. St. 81.

6. Where the statute prohibits a specific thing, that fact, of course, furnishes an all-sufficient reason for the decision, and, as the state statutes generally go more into detail than the federal statutes, the state decisions are less controlled by general considerations. When the legality of the particular act is to be tested by whether it violates general statutory prohibitions upon restraints of trade or commerce, the courts give various reasons for their conclusions. Different forms of expression are used; but, when reduced to the lowest terms, it seems that if any one thing may be said to be the test, it is the effect upon competition. Combinations are not per se illegal, any more than are contracts, agreements, and understandings generally; but, when the purpose of either is to destroy competition in trade or commerce, the particular transaction falls within the prohibitions of the anti-trust statute. The acts which are specifically forbidden by the statute are contrary to the public policy of the state because they are thus forbidden (Stewart v. Erie & W. Transp. Co., 17 Minn. 348 [372]), and the effect upon competition furnishes a reasonably accurate test for cases which arise under the general language of the statute.

The definition of monopoly involves the same principle, and contracts and combinations which tend to create a monopoly are against public policy, and therefore illegal, because they deprive the community of the benefits of competition and thus place the power to control production or fix prices in the hands of a few persons.

But it does not follow that every contract or combination which in any degree tends to restrict competition is illegal. So strict a rule. would invalidate innumerable ordinary business transactions, which are unobjectionable and necessary that business shall not completely stagnate. As said in Hopkins v. U. S., 171 U. S. 578, 592, 600, 19 Sup. Ct. 40, 43 L. Ed. 290: "The contract condemned by the statute is one whose direct and immediate effect is a restraint * * * of commerce. * * * The act * * * must have a reasonable construction or else there would scarcely be an agreement or contract among business men that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it." The anti-trust statutes were never designed to forbid such transactions, and it has been universally held that contracts and combinations which tend to promote business, and which only remotely, incidentally, and indirectly restrain competition, are not forbidden. If the necessary effect of the combination is to stifle or to directly or necessarily restrict free competition, it is under the ban of the law, whatever may have been the intention of the parties. But if "it promotes or but incidentally or indirectly restricts competition, while its main purpose and chief effect, are to foster the trade and to increase the business of those who make and operate it, then it is not a contract, combination, or conspiracy in restraint of trade, within the true interpretation of this act, and it is not subject to its denunciation." Whitwell v. Continental Tobacco Co., 125 Fed. 454, 458, 60 C. C. A. 290, 64 L. R. A. 689; Hopkins v. U. S., 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290; Anderson v. U. S., 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300; U. S. v. Joint Traffic Assn., 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136; Montague & Co. v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608; Cincinnati, P., B. S. & P. Packet Co. v. Bay, 200 U. S. 179, 184, 26 Sup. Ct. 208, 50 L. Ed. 428; State v. Goodwill, 33 W. Va. 179, 10 S. E. 285, 6 L. R. A. 621, 25 Am. St. 863;

Butchers' Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. H. Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585; Welch v. Phelps, 89 Tex. 653, 36 S. W. 71; People v. Gillson, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. 465; Walsh v. Dwight, 40 App. Div. 513, 58 N. Y. Supp. 91.

7. With these general principles in mind, we proceed to the consideration of the facts of the case at bar. It is reasonably clear that the purpose to be accomplished by rule 26 is not one which is forbidden by the anti-trust statute, and also that, even though it were within the scope of the statute, it is not illegal, because it does not destroy or restrict competition in the business of producing, buying, selling, or distributing any articles dealt in by the board of trade or its members. The requirement with reference to the rates on money advanced by the members and that relating to the division of commissions between members do not require any particular consideration. They clearly are not violations of the statute. The state's case must rest upon the alleged illegality of that provision of the rule which requires members to charge uniform commissions for their services in making sales for their customers. The other provisions are incidental to this, and are designed to secure its observance and enforcement. The board of trade is a combination of men engaged in the same business who have bound themselves by contract and agreement to charge uniform rates for personal services. It is the established law of this state that a man, or any number of men, may, unless under contract obligations, or engaged in an employment which charges them with a public duty, refuse to deal with any man or class of men, and that this right may be exercised singly or in combination with others. In Bohn Mnfg. Co. v. Hollis, 54 Minn. 223, 55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. 235, 319, the court said: "The right which one man may exercise singly, many, after consultation, may agree to exercise jointly, and make simultaneous declaration of their choice. This has been repeatedly held as to associations or unions of workmen, and associations of men in other occupations or lines of business must be governed by the same principles." In Ertz v. Produce Exchange, 79 Minn. 140, 143, 81 N. W. 737, 48 L. R. A. 90, 79 Am. St. 433, the court said that "within proper limits, it is both lawful and commendable for men to com-

bine for the purpose of securing better wages or larger returns from their business ventures."

The right of laboring men to combine for the purpose of regulating their wages can no longer be seriously denied. Five years after the enactment of the Minnesota anti-trust statute this court, in Gray v. Building Trades Council, 91 Minn. 171, 179, 97 N. W. 663, 63 L. R. A. 753, 103 Am. St. 477, said: "A strike for the purpose of securing better wages or otherwise bettering the condition of the strikers is not unlawful, though the result thereof is a combination between the striking employees, and results incidentally in the injury of others." In Jacobs v. Cohen, 183 N. Y. 207, 212, 76 N. E. 5, 2 L. R. A. (N. S.) 292, 111 Am. St. 730, it was held that laboring men have the right "to combine and to co-operate for the promotion of such ends as the increase of wages. * * * Their combination is lawful, when it does not extend so far as to inflict injury upon others, or to oppress and crush them by excluding them from all employment, unless gained through joining the labor organization, or trades union." The right to form a combination for the purpose of fixing wages is now thoroughly established, and numerous cases sustaining it will be found cited in 24 Cyc. 819. A rule of law applicable to men who work with their hands should, when no other principle of public policy contravenes, be equally applicable, when the general purpose to be accomplished is the same, to men whose work is more intellectual.

If a combination for the purpose of regulating what one class of men in the community shall receive for their personal services is valid, because not within the scope of the anti-trust statute, it cannot be that any combination for the same purpose is prohibited because of the character or description of the individuals who enter into the combination. The classification must be along the line of purposes, and not persons. In the light of the history of legislation relating to agreements and combinations to fix and regulate wages, the often-declared rule of public policy with reference thereto, the purposes for which combinations are specifically forbidden by the statute, and the fact that such combinations affect production and prices of commodities but indirectly, we are of the opinion that combinations to fix and regulate the prices which shall be charged for wages and other forms of personal service are not within the prohibitions of our statute. Labor, wheth-

er physical, intellectual, or a combination of the two, is not by any fair rule of construction an "article of trade, manufacture, or use," or an "article, commodity, or utility" which "enters into the manufacture of any article of utility," within the meaning of those words as used in the statute. Agreements to regulate the price of personal services, when standing alone, have never been held to be agreements in restraint of trade, and it is only when connected with other contracts and conduct which are in themselves illegal that they come within the purview of the federal anti-trust law.

In the recent case of Rohlf v. Kasemeier (Iowa) 118 N. W. 276, 278, it was held that under the Iowa statute, which prohibits combination to regulate the price of any "article of merchandise, commodity," etc., a union of laborers or professional men—in this instance physicians—for the purpose of advancing wages or charges is not unlawful. "If the contention of appellant be correct," said Deemer, J., "the statute covers all kinds of personal labor, both skilled and unskilled, under the term 'commodity.' Indeed, this is the broad claim made by counsel. Now, whilst there is a class of political economists who treat labor as so much merchandise, the wage being regulated simply by supply and demand, there is another class, which, taking account of the personal equation, sees in it something more than a commodity, and refuses to subscribe to the doctrine that supply and demand alone regulate the price. This latter class of economists refuses to accept the doctrine that a man is rich because he has stored away within him many days' work, and are convinced that his necessities, quite as often as the demand for his labor, fix the stipend which he is to receive. In other words, the laborer, skilled or unskilled, is not regarded as standing on an equality with him who barters in goods and merchandise. * * * The only ground upon which appellant can stand with any show of plausibility is that labor is a commodity to be bought, sold, or produced, as merchandise. This is a strained and unnatural construction, and gives to the word 'commodity' a meaning which is perhaps permissible, but is not the commonly accepted one. * * * It seems to be the almost universal holding that it is no crime for any number of persons without an unlawful object in view to associate themselves together, and agree that they will not work for or deal with certain classes of men, or work under a certain price or without certain conditions.

Carew v. Rutherford, 106 Mass. 1, 14, 8 Am. 287; Com. v. Hunt, 4 Metc. (Mass.) 111, 134, 38 Am. Dec. 346; Rogers v. Evart (Sup.) 17 N. Y. Supp. 264, 268; U. S. v. Moore (C. C.) 129 Fed. 630."

It is possible that under some of the state statutes a combination to fix and regulate the value of wages or personal service is invalid, because included within the specific prohibitions of the statute. But the statutes almost without exception are directed to combinations which affect the production or price of some useful commodity, and it is very clear that personal services are not included under such designations. The Michigan statute of 1899 was broader than the Minnesota statute, particularly in that it denounced combinations of capital, skill, or arts. But in Hunt v. Riverside, 140 Mich. 538, 549, 104 N. W. 40, 112 Am. St. 420, the distinction between wages and articles which are produced, bought, and sold in the market was clearly recognized. It was held that, while agreements between plumbers fixing the price at which they would sell plumbers' supplies were illegal, agreements fixing and regulating the price of labor employed in executing lawful contracts were not forbidden. "If that statute" said the court, "forbids such agreements, it follows that it forbids all agreements fixing and regulating the price of labor, and that associations, whether of employees or employers, when endeavoring to fix and regulate the price of labor, are engaged in a criminal undertaking. Does that statute forbid such agreements? In general, it may be said that the statute forbids certain contracts and certain defined trusts. An agreement fixing and regulating the price of labor is not one of these contracts, nor one of these trusts. See Cleland v. Anderson, 66 Neb. 258. If it may be said that an agreement fixing the price of labor violates the statute when it forms part of an undertaking which the statute forbids, it must also be said that it does not violate the statute unless it does form part of some undertaking forbidden by the statute."

There has been some difference of opinion as to whether insurance is an article of commerce or a commodity within the meaning of such statutes. In State v. Phipps, 50 Kan. 609, 31 Pac. 1097, 18 L. R. A. 657, 34 Am. St. 152, and Beechley v. Mulville, 102 Iowa, 602, 70 N. W. 107, 71 N. W. 428, 63 Am. St. 479, it was held to be a "commodity." Some statutes expressly specify contracts fixing the rates to be paid for insurance and the commissions to be charged by insurance

agents. In Queen v. State, 86 Tex. 250, 270, 272, 24 S. W. 397, 22 L. R. A. 483, it was held that neither under the common law nor the Texas anti-trust statute is it illegal to enter into a combination to establish uniform rates of insurance and of commissions to agents. The court said: "Labor is necessary to production and transportation, and therefore it is not merely an aid, but a necessity of commerce. It is advantageous to the public, and in that sense they have an interest in it. The services of professional men are likewise indispensable in most civilized communities, and are presumably likewise advantageous to the public. The public have an interest in them, in the same sense in which they have an interest in the business of insurance. It follows, therefore, that if insurance companies are to be brought within the rule that makes agreements to increase the price of merchandise illegal, upon the ground that the public have an interest in their business, agreements among laborers and among professional men not to render their services below a stipulated rate should be held contrary to public policy and void, upon the same grounds. Combinations among workingmen to increase or maintain their wages by unlawful means are unlawful. 'Encouragement to workmen in their endeavors to associate themselves into organizations for their mutual benefit, has settled beyond question that unemployed workmen may unite and agree not to work unless for a certain price. This is a plain right, upon which no doubt ought ever to have existed.'" People v. Fisher, 14 Wend. 9, 28 Am. Dec. 508.

More v. Bennett, 140 Ill. 69, 29 N. E. 888, 15 L. R. A. 361, 33 Am. St. 216, seems to support the contention that a combination to fix the rate to be charged for personal services is illegal. That case grew out of an attempt of the law stenographers of the city of Chicago to fix the prices at which they would work. It is criticised in Queen v. State, supra, and the cases cited by the court do not seem to be applicable upon the facts. As a matter of fact, such stenographers furnish more than their personal services, and the compensation is measured by the quantity of the product of their labors. Thus in the ordinary case of a court stenographer, who furnished a transcript of evidence, the party ordering it pays for what he receives at a fixed price per folio. The proposition under consideration in More v. Bennett did not include ordinary stenographers who work by the day or month, and

it cannot be that such persons cannot combine and co-operate for the purpose of fixing or raising their wages, while workingmen generally are permitted to do the same thing, with the approval of the law.

This conclusion is not inconsistent with the decision of the supreme court of the United States that the Sherman anti-trust law applies to combinations of workingmen as well as capitalists, or with the cases which have held certain anti-trust statutes unconstitutional because they exempted certain classes of people from their operation. The right of proper classification is conceded, and the statute must apply equally to all members of the class; but our statute is directed to combinations for certain purposes, and we hold that combinations and agreements, the sole and only purpose of which is to fix the charges that shall be made for personal services, are not within the prohibitions of the statute.

8. But, if it should be conceded that the agreement or combination effected by rule 26 is within the general scope and purpose of the anti-trust statute, it would not violate the statute because it does not create a monopoly, and its direct and necessary tendency is neither to restrain trade by preventing competition in the business of buying and selling grain on commission, nor to limit, fix, control, maintain, or regulate the price or production of any article of trade, manufacture, or use bought and sold within the state, nor to prevent or limit competition in the purchase and sale thereof. As already stated, the board of trade neither buys nor sells grain. The members act as the agents of the producers and purchasers of the grain, and the regulation of their commissions for such services can have no appreciable effect upon either the production or the price of the grain. It is a fixed charge, which must be paid, and the price which the producer obtains for the grain may be affected indirectly thereby. But the question is whether the production or price is directly or to any appreciable extent controlled or regulated by the rule which makes the charge uniform, instead of variable—definite and known, instead of uncertain and unknown. So long as the rate of commission is reasonable, as it is conceded to be in this instance, it must be for the benefit of the producer to know in advance what it will cost in commission to have his grain sold. A rule which determines the handling charges, and makes the charge the same per bushel to the farmer who ships one hundred sacks and the

elevator company which ships one hundred cars, cannot be held to be against public policy. In fact public policy requires that such charges shall be definite, certain, and uniform, and this seems equally true as to commissions for sales, when made under the peculiar conditions under which the grain business is conducted. A board of trade which requires its members to treat all its customers exactly alike in the matter of charges for services no more destroys competition than does a railroad when it charges all shippers the same rate for conveying freight.

It is common knowledge that competition between commission men for the business of the producers is in fact strong, and success in getting the business depends, not upon offering to transact it for less than the uniform rate of commission, but upon the skill and facilities possessed for obtaining the highest price for the grain from the elevator and mill men who are generally the purchasers. There is no fixed price at which sales must be made. If A. can secure a cent a bushel more for B.'s grain than can C. or any other commission man, he will get the business, and the producer who has selected him to make the sale will get the benefit of his superior skill and energy. Competition of this character exists on all boards of trade and chambers of commerce, and it is inconceivable that a rule which requires all the commission men who are members of the board or chamber to charge the same rate of commission for the same service can materially affect or control either the production of grain or the price at which it sells. Of course, in a remote and indirect way, every charge and item of expense which attaches to the marketing of grain or other products affects to some extent the prices received by the producers and paid by the ultimate purchaser. But contracts and agreements for certain and uniform charges, which are for the benefit of all and operate only indirectly on production and prices, are not within the prohibitions of the statute.

The purpose and effect of this rule are not to stifle competition, but to protect the members of the board, and foster their business and trade, and prevent it from becoming demoralized to the injury of all parties, including the consumer. The propriety of such rules, indirectly, at least, received the approval of the supreme court of the United States in Anderson v. U. S., 171 U. S. 604, 616, 19 Sup. Ct. 50, 43 L. Ed. 300, where Mr. Justice Peckham said: "From very early times it has been the custom for men engaged in the occupation of buying

and selling articles of a similar nature at any particular place to associate themselves together. The object of the association has in many cases been to provide for the ready transaction of the business of the associates by obtaining a general headquarters for its conduct, and thus to insure a quick and certain market for the sale or purchase of the article dealt in. Another purpose has been to provide a standard of business integrity among the members by adopting rules for just and fair dealing among them and enforcing the same by penalties for their violation. The agreements have been voluntary, and the penalties have been enforced under the supervision and by members of the association. The preamble adopted by the association in this case shows the ostensible purpose of its formation. It was not formed for pecuniary profits, and a careful perusal of the whole agreement fails, as we think, to show that its purpose was other than as stated in the preamble. * * * And that the result naturally to be expected from an enforcement of the rules would not directly, if at all, affect interstate trade or commerce."

We think the same statement may be made with reference to the rules of the Duluth Board of Trade in their relation to intrastate trade and commerce. In a recent text-book written by one of the judges who decided the case of U. S. v. American Tobacco Co. (C. C.) 164 Fed. 700, which makes the restriction of competition conclusive, it is said that, "in order to come within the provisions of the federal statute, the direct effect of a combination must be in restraint of interstate commerce," and "that a voluntary association or 'exchange' formed by dealers in articles of a similar nature in a particular locality for the purpose of fairly regulating the methods of conducting business and establishing a general headquarters, and the by-laws of which provide rules for fair dealing among the members, but which exercises no control over prices or production, is not in contravention of the statute. Neither the object nor consequence of such an association is to suppress competition and its effect upon interstate commerce, if any, is remote." Noyes, Intercorp. Rel. (2d Ed.) § 395.

Anderson v. U. S., 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300, and Hopkins v. U. S., 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, while not exactly in point, tend to sustain the respondent's views as to the legality of this rule of the Duluth Board of Trade. The case

which comes the nearest to sustaining the appellant's contention is State v. Wilson, 73 Kan. 334, 80 Pac. 639, 84 Pac. 737. That was a criminal prosecution of the defendant upon the charge of obtaining money under false pretenses, by selling cattle which he represented to be free from incumbrance when in fact they were covered by a mortgage. The defense was that the mortgage was void, because based upon a transaction which was made criminal by the Kansas anti-trust statute. The defendant offered to prove that the mortgage was given to a member of the Kansas City Live Stock Exchange, which was an association of persons engaged in buying and selling live stock for others and practically controlling that business at Kansas City; that a by-law of such association forbade a member from charging a less commission for such services than fifty cents a head; and that a part of the consideration of the notes, to secure which the mortgage was given, was a charge for the services of the mortgagee in purchasing the cattle covered by the mortgage. This evidence was excluded, and for the error alleged to have thus been committed the defendant demanded a new trial. The statute forbade combinations of "capital, skill and acts" for various enumerated purposes, one of which was "to create or carry out restrictions in the free and full pursuit of any business authorized or permitted by the laws of this state." It was held that the Kansas City Live Stock Exchange was an illegal organization within the meaning of this section of the statute. The statute was quite specific, and may well have been designed to reach such a case; but it is not a controlling authority in favor of the appellant, under our statute, upon the facts disclosed by this record.

A somewhat extended investigation of the law and careful consideration of the facts of this case have convinced us that the Duluth Board of Trade has not violated the Minnesota statute, and that the decision of the learned trial judge was correct.

The judgment is therefore affirmed.